## CLIFFORD BANKING COMPANY v. DONOVAN COMMISSION COMPANY, Appellant.

### Division One, March 30, 1906.

1. **MONEY HAD AND RECEIVED: Scope of Action.** The action for money had and received is one favored in the law, and the tendency is to widen its scope. It is a flexible form of action, levying tribute on equitable, as well as strictly legal, doctrines. It has become axiomatic that the action runs where defendant has received or obtained possession of the money of plaintiff, which in equity and good conscience he ought to pay over to plaintiff.

2. ————: ————: **Pleading: Privity.** It is not necessary in an action for money had and received to allege a promise to pay, nor is privity of contract required.

3. ————: **Constructive Trust: Bill in Equity.** Money of plaintiff bank obtained by defendant through the fraudulent practices of plaintiff's clerk, is held by defendant under a constructive trust for plaintiff, though defendant may be innocent of collusion in the fraud. And an action for money had and received partaking of the nature of a bill of equity, may be employed to reach money held under a constructive trust.

4. **BANK: Expired Charter: Assignment of Demands to New: Point Raised by Debtor of Old.** It is no concern of a debtor of a bank whose charter has expired by limitation and whose assets passed into the hands of its directors as trustees and were by them assigned to the new bank rechartered under the same name, to dispute the title of the new bank when sued on drafts fraudulently issued by an employee of the old bank, whose proceeds the debtor received. The corporate integrity of the new bank cannot be assailed by a debtor of the old bank, when called on to pay, by a collateral attack. Such creditor is not injured thereby, and he cannot plead his wrong as a defense. The State is the proper party to complain, nor can it do so if the old bank was not insolvent.

5. ———: **Drafts: Forged and Fraudulently Issued by Clerk: Two Innocent Parties: Option Deals.** The principle that "where one of two innocent parties must suffer, the loss must fall on him who afforded the opportunity for the wrong," is applicable to negotiable instruments, and in any case the party invoking it must be an innocent party, that is, a party who holds the paper bona-fide and for value. And where it was usual for a bank cashier to sign up drafts in blank, leaving the same to be filled out by a clerk, and that clerk within 39 days filled out such drafts to the amount of $11,000 and sent them to defendant commission company to be used in buying margins on grain and requested defendant to send his gains to him in cashier's checks or drafts, a plan to conceal his dealings with appellant, and that request is complied with, and defendant is sued by the bank for the amount of the drafts, it would be held, if necessary, that defendant, in view of the statutes relating to option dealing, was not an innocent party. But such a holding is not necessary, for the law is that, if a check or bill of exchange or other commercial paper is shown to have originated in fraud perpetrated against the maker, the burden is upon the holder to show that he holds them without notice of the fraud, and the forgery having been proved and defendant standing mute, defendant is not an innocent party.

6. ———: ———: ———: ———: **Payee's Liability to Maker.** The plaintiff bank had funds on deposit in the Laclede Bank of St. Louis, and plaintiff's cashier customarily signed blank drafts and left them in his absence to be filled up by a trusted clerk to meet the demands of customers. The clerk filled out such drafts to the amount of $11,000 upon the Laclede Bank as drawee and sent them to defendant commission company to be used in option deals for his benefit, and they were payed by the drawee to defendant, and on the books of his bank the clerk made entries showing the issuance of drafts, of corresponding numbers, amounting to $10.89. *Held,* first, that the Laclede Bank was not liable to plaintiff, because the signature of the cashier was his genuine signature and there were no other *indicia* of alteration, erasures, etc.; *second,* nor could the Laclede Bank recover from the commission company, the payee, for it did not recoup plaintiff for the loss, and therefore it has suffered no injury; *third,* but the money on deposit with the Laclede Bank was the property of plaintiff, and unless defendant was an innocent party and received it with clean hands, it is liable to plaintiff for the proceeds.

7. **EVIDENCE: Hearsay: Sufficiency: Payment of Bank Drafts.** A bookkeeper in the employ of plaintiff bank had forged some drafts drawn against plaintiff's correspondent, and the charge

was that they were drawn in favor of defendant commission company, and paid to defendant by the correspondent. The drafts could not be produced at the trial, they being presumably destroyed by the clerk on their return to plaintiff. The cashier presented a statement of the correspondent showing the amount of money received by it from plaintiff and the amount charged by it to the plaintiff, and this was objected to as hearsay and as not connecting defendant therewith, but it was not objected that the books of the drawee were the best and primary evidence to show (1) the accounts kept between the two banks, or (2) that the drawee had paid the drafts, or (3) that the defendant had got the proceeds of the drafts. *Held*, that evidence was competent to show that the correspondent or drawee had received the drafts and paid them, and if other evidence was forthcoming to prove that defendant had received their proceeds the court did not err in admitting it. And proof that defendant received drafts of a certain amount and of numbers corresponding to the maker's register, and credited the clerk with the proceeds two days later, the credits in the statement indicating that the drafts had been cashed by the drawee, is sufficient to create a reasonable inference and to establish a prima-facie case that defendant received the proceeds.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood*, Judge.

Affirmed.

*Chester H. Krum* and *McDermott & Crigler* for appellant.

(1) Appellant, as well as the putative assignor of the respondent, was innocent in the premises. Where one of two who are innocent must suffer, the loss must fall on him who afforded the opportunity for the wrong. Had not the original bank been remiss and grossly negligent, the loss would not have occurred. Bank v. Armstrong, 62 Mo. 67; Neuhoff v. O'Reilly, 93 Mo. 164. (2) The bank checks were negotiable instruments, if instruments at all, and appellant was a purchaser for value, without notice. Famous Co. v. Crosswhite, 124 Mo. 34; Building & Loan Assn. v. Bank, 126 Mo. 87. (3) Upon the assumption that the checks were forgeries, appellant did not obtain on them moneys of the respondent.

The relation of debtor and creditor existed between the original bank and the Merchants-Laclede National Bank. The original and every subsequent deposit is, in strict legal effect, a loan by the depositor to the bank. Payments to the customer, on his checks, are payments *pro tanto* of the loan. It was the moneys of the last-named bank which appellant received. (4) The petition proceeds upon the hypothesis that McQueen forged and converted to his own use the checks which appellant bought. There was no property in the original bank in the forgeries, and there was no property of the bank which the employee could convert. The drawee which paid the forged check was liable to the original bank. The attempted assignment to the new bank by the directors of the original bank passed nothing, because there was nothing to pass. (5) The so-called trustees, who were directors of the original bank, were without authority to transfer assets of the bank in dissolution to a new bank in payment of its capital. A bank should be wound up by the State. The trustees of a dissolved corporation have no authority to turn over its assets to a new corporation as its capital. The assignment of assets was equivalent to a general voluntary assignment and void under the statute. R. S. 1899, secs. 976, 1305, 1306. (6) The accounts and memoranda between the original bank and the Merchants-Laclede Bank were incompetent evidence and should have been excluded. Investment Co. v. Vette, 142 Mo. 560; Banking House v. Darr, 130 Mo. 660; State v. Levy, 90 Mo. App. 643, 168 Mo. 581.

*Thomas B. Harlan* and *Perry Post Taylor* for respondent.

(1) McQueen's acts with reference to the drafts constituted forgery. State v. Kroeger, 47 Mo. 552. (2) (a) The drafts, as signed in blank, were the property of respondent's assignor and were made of value to ap-

pellant by the wrongful and criminal acts of McQueen in filling them out as to dates and amounts and making them purport to be payable to appellant's order and then wrongfully and without authority delivering them to appellant. These wrongful acts did not vest the title to the drafts in appellant and, as appellant received the proceeds thereof, to the loss of respondent's assignor, appellant, in the absence of an affirmative showing on its part that it was a bona-fide holder, for value, is liable to respondent for money had and received. Keim v. Vette, 167 Mo. 399; Johnson-Brinkman Co. v. Bank, 116 Mo. 558; Richardson v. Drug Co., 92 Mo. App. 515; Kitchen v. Commission Co., 105 Mo. App. 463; Famous Co. v. Crosswhite, 124 Mo. 34; Koch v. Branch, 44 Mo. 542; Considine v. Beers, 1 Abb. Ct. App. Dec. (N. Y.) 333; Talbot v. Bank, 1 Hill (N. Y.) 295; Mason v. Waite, 17 Mass. 563; Wilson v. Turner, 168 Ill. 403; Leete v. Mill & Mining Co., 88 Fed. 964; 2 Ency. Pl. & Pr., p. 1016. (b) If the appellant was a bona-fide holder for value, it was peculiarly within its power to show that. Since it did not even attempt to make such a showing, it must be presumed that it did not occupy that relationship to the drafts, the proceeds of which it is attempting to enjoy at the expense of respondent and its assignor. Hence, in this action, it should be compelled to make restitution of the funds it illegally enjoys to respondent who has been wrongfully deprived of their use. Authorities supra. (3) This is an action for money had and received. It is like a bill in equity. If, therefore, the case having been tried before the court without the intervention of a jury, it appears from all the evidence that appellant received, as the proceeds of certain drafts wrongfully taken from respondent, certain money, in truth and in fact rightfully belonging to respondent, then, in equity and good conscience, appellant should make restitution. Richardson v. Drug Co., 92 Mo. App. 520; Talbot v. Bank, 1 Hill (N. Y.) 295; 2 Ency. Pl. & Pr., p. 1016;

Mason v. Waite, 17 Mass. 563; Wilson v. Turner, 168 Ill. 403; Magoffin v. Muldrow, 12 Mo. 512; White v. Bank, 64 N. Y. 319; Davis v. Krum, 12 Mo. App. 286. (4) When it was once established that the drafts were obtained by the perpetration of a fraud, of a crime, the burden of proof shifted to appellant to show that it was an innocent purchaser and for value. Famous Co. v. Crosswhite, 124 Mo. 39; Keim v. Vette, 167 Mo. 399. (5) The petition does not allege or even infer that appellant bought the drafts; on the contrary, it alleges that appellant gave no value whatever for them. While there may have been "no property in the forgeries" as such, yet the original bank did have a property in the original drafts signed in blank, by the forgery whereof and their unlawful delivery to appellant, the latter was enabled to procure money to the loss of the owner of these drafts signed in blank. By these actions a claim arose in favor of the original bank against appellant, which claim was assignable. Doering v. Kenamore, 86 Mo. 591; Snyder v. Railroad, 86 Mo. 620. (6) This assignment cannot be collaterally attacked by appellant. 4 Cyc. Law & Proc., p. 210. A voluntary assignment for the benefit of creditors provides for the return of the surplus, if any shall exist, to the assignor. There was no such provision here. It was an absolute and unconditional transfer. 4 Cyc. Law & Proc., p. 120. (7) The evidence shows that appellant had knowledge of McQueen's wrongful acts. The drafts were drawn not on any funds of McQueen, but on the funds of the bank by drafts made payable to appellant. Appellant had no account with respondent's assignor, had no funds on deposit with it, bought no exchange from it but accepted the drafts and placed them to the individual credit of McQueen, gave him nothing of value for them and even undertook to shield McQueen by complying with his request to have all checks that it (appellant), might have occasion to send McQueen "made by cashier or draft." With such notice or knowledge

on the part of appellant of the ownership and rights of the bank in the drafts or the proceeds thereof, there can be no doubt of the obligation of appellant to make restitution of the sums obtained by it on said drafts. Kitchens v. Commission Co., 105 Mo. App. 469. (8) The relation of appellant to these drafts and the proceeds thereof constituted appellant trustee of a constructive trust of which respondent's assignor was the beneficiary, and appellant upon refusal to make restitution was liable in an action for money had and received. 1 Perry on Trusts (Ed. 1899), sec. 211; 3 Pomeroy's Equity Jur. (3 Ed.), secs. 1044, 1047, 1051, 1053; York v. Bank, 105 Mo. App. 138; Clark v. Bank, 57 Mo. App. 285; Deal v. Bank, 79 Mo. App. 269. (9) The judgment was manifestly for the right party and should therefore be affirmed. Cass County v. Bank, 157 Mo. 133; Redman v. Adams, 165 Mo. 71.

LAMM, J.—This is a suit for money had and received. Defendant stood below on plaintiff's case. Both parties are domestic corporations — the one, a banking company with a small capital in Clarksville, a village in Pike county; the other, domiciled in St. Louis as a commission concern. Plaintiff is the successor of a banking corporation of the same name, which did business in the same village, whose charter expired by limitation, and whose affairs are in process of liquidation at the hands of its last board of directors as trustees; and plaintiff sues in the capacity of such successor and by virtue of being the owner by assignment of the claim in suit, an asset of the old bank. The pleadings are unquestioned and, hence, need not be set forth, further than to say that the answer is a general denial, and the petition, by formal averments, sets forth the incorporation of the old, as well as of the new bank, and of defendant company, the expiration of the old bank's charter by limitation and that its affairs are in the hands of trustees for settlement, the assignment to

plaintiff of the claim in suit, the demand upon defend-
ant, the refusal to pay, and then, as the gist of the cause
of action, complains as follows:

"That on or about the 1st day of March, 1901, and
for some time prior thereto, and from said date to
about the 1st day of May, 1901, one T. S. McQueen was
a clerk and employed in and by said bank, and that on
divers days between the said dates of March 1, 1901,
and May 1, 1901, he, the said T. S. McQueen, did forge
and convert to his own use six drafts, the property of
the said bank drawn by it upon the Merchants-Laclede
National Bank of the city of St. Louis, in the State of
Missouri, wherein the said bank had on deposit a sum
of money sufficient to pay the same, and did then and
there fraudulently forge and alter said drafts by writ-
ing in the name of this defendant as the payee thereof,
and by inserting the amounts to be paid to defendant
thereon respectively:  Three each in the sum of one
thousand dollars, two each in the sum of three thousand
dollars, and one in the sum of two thousand dollars;
that the said T. S. McQueen did thereafter deliver each
and all of said drafts to the defendant, and it did im-
mediately thereafter present said drafts to said Mer-
chants-Laclede National Bank, and receive from said
bank therefor the sum of eleven thousand dollars, the
property of the said Clifford Banking Company.

"That the said T. S. McQueen, nor the said Clifford
Banking Company, nor the said trustees, nor the plain-
tiff never had or received from the defendant, and the
defendant never gave or paid either to the said Mc-
Queen, the said Clifford Banking Company, trustees,
nor this plaintiff, any value or valuable consideration
therefor."

At a trial to the court without a jury, proof of the
formal averments of incorporation, of the transfer to
plaintiff bank of the claim in suit, of the expiration
of the old charter and that the affairs of the old bank
were in the hands of its last board of directors as trus-

tees for liquidation, was made. Demand and refusal to pay were admitted, and the facts uncovered by plaintiff, pertaining to the gist of the action, as set forth in the foregoing paragraph of the petition, are that McQueen was the bookkeeper and acting teller of the old banking company from 1888 to May 1, 1901. On the latter date (under the spur of a neglected duty) he resigned. In a general way, his duties were to keep the books and pay out and take in money over the counter. Against the temporary absence of the cashier, it was the custom of such cashier to sign blank drafts to be used in conducting the business of the bank. These blank drafts, so signed by the cashier, were left with McQueen, who, when the cashier was not by, had authority, in the ordinary course of the bank's business, to fill in date, amount and payee and utter a draft as a live, current bill of exchange to anyone buying the same. As we understand the record, all these blank drafts were lithographed and each and all of them were directed to the Merchants-Laclede National Bank of St. Louis, Missouri (hereinafter called the Laclede Bank), which latter bank was the depository and correspondent of the Clifford Banking Company, and thereat it kept a line of deposits (against which it sold exchange) of a figure sufficient to pay the drafts to be presently considered. The only blanks left in the signed drafts were for the amount in dollars and cents, the date of issue and the name of the payee. All drafts used by the bank were numbered consecutively, and a book, called the "draft register," was kept with a corresponding number. We infer this draft register was, to all intents and purposes, but a stub-book and that each draft had a stub, with a lithographed number corresponding to that on the draft, on which memoranda were intended to be noted showing date, name of payee and amount of draft issued.

Kept in McQueen's handwriting, the foregoing draft register showed a series of modest and innocent-

looking drafts drawn and issued from March 16, 1901, to April 22, 1901, inclusive, to the persons, on the dates, of the amounts and bearing the serial numbers shown by the following tabular statement (all of them directed to the Laclede Bank as drawee) :

| Number | Date | Amount | Payee. |
|---|---|---|---|
| 133071 | March 16, 1901 | $2.32 | J. H. Carr, Secretary. |
| 133123 | March 23, 1901 | 2.35 | Boatmen's Bank. |
| 133182 | March 30, 1901 | 2.00 | J. G. Brandt Shoe Co. |
| 133229 | April 4, 1901 | 2.22 | Citizens' Ins. Co. |
| 133319 | April 15, 1901 | 1.00 | B. Nugent & Bro. |
| 133389 | April 22, 1901 | 1.00 | W. H. Black. |

It will be seen that this table shows a total of exchange sold, ostensibly to the above-named persons, of $10.89. But in truth and in fact these amounts are an exception to the rule laid down in the fireside phrase, "figures never lie," and that exception is shadowed forth in the modifying phrase, "but those that use them may;" because the drafts themselves were cashier's checks upon the Laclede Bank, aggregating $11,000. Moreover, they were not drawn in favor of the payees named in the draft register. To the contrary, the last four were introduced in evidence and bore the dates, payees and amounts shown by the following table :

| Number | Date | Amount | Payee. |
|---|---|---|---|
| 133182 | March 30, 1901 | $3,000 | Donovan Com. Co. |
| 133229 | April 4, 1901 | 3,000 | Donovan Com. Co. |
| 133319 | April 15, 1901 | 2,000 | Donovan Com. Co. |
| 133389 | April 22, 1901 | 1,000 | Donovan Com. Co. |

It was admitted at the trial that defendant got the proceeds of the four drafts last-above, aggregating $9,000.

The state of the proof in relation to the first two drafts was this: both said drafts had been either lost or destroyed. Both of them had been signed in blank by the cashier, as said, and left in McQueen's custody.

The cashier never saw said two drafts after he signed the blanks bearing the corresponding numbers. One of the drafts was seen in a bundle of returned cancelled checks, accompanying a statement of accounts rendered by the bank to the old Clifford Banking Company, but disappeared and presumably both of them were done away with by McQueen.

To supply a certain missing link in the proof up to this point, to-wit, that drafts No. 133071 and 133123 were issued for $1,000 each and cashed by the Laclede Bank for those amounts, the monthly statement of account rendered by the bank to the Clifford Banking Company was used by the cashier, while on the witness stand, and he was allowed to testify therefrom. In order to preserve and point the force of certain objections lodged against the introduction of testimony by appellant's counsel, it will be profitable to precede the record pertaining to the two drafts in hand with the record relating to the other four drafts aggregating $9,000, which defendant acknowledges getting the proceeds of. The record necessary is as follows:

"Q. Have you that account in court? A. Yes, sir.

"Q. Let us see it, please. (Witness produces paper.)

"Q. Is this the account that was rendered? A. Yes, sir.

"Q. This is made by the Merchants-Laclede National Bank? A. Yes, sir.

"Q. And what does it represent or purport to be? A. It represents the amounts received and credited by them and the amounts debited by them.

"Mr. Krum: We object to this, if the court please, as being not competent, being hearsay, as between the Merchants-Laclede National Bank and this defendant.

"The Court: I think that the manner in which these accounts were kept as between these banks is com-

petent testimony, tending to show the nature of the transaction. I overrule the objection, and defendant duly excepted.

"Mr. Harlan: Q. What entry, if any, do you find in the statement furnished you by the Merchants-Laclede National Bank, dated May 1st, relative to draft No. 133319? A. 'April 17, 1901, 133319, $2,000' (referring to statement).

"Q. What entry do you find in this statement relative to draft No. 133389? A. 'April 24, 1901, 133389, $1,000.'

"Q. What entry do you find relative to draft No. 133229? A. 'April 9, 1901, 133229, $3,000.'

"Q. What entry do you find relative to draft No. 133182? A. 'April 2, 1901, 133182, $3,000.'

"Q. Are these respective drafts identified in that statement by number? A. Yes, sir.

"Q. And that number corresponds to the number on the draft? A. Yes, sir.

"Q. What do the dates, as appear in that statement, refer to? A. The date paid by the paying bank.

"Mr. Krum: There will be no dispute, your honor, that the proceeds of these drafts went to the defendant company. . . .

"A. I find that on March 16, 1901, draft No. 133071, is entered on the draft register in the name of 'J. H. Carr, Secretary,' for $2.32 with five cents exchange. I find that on the statement of the Merchants Laclede National Bank on March 19, 1901, the same No. 133071 is charged to the Clifford Banking Company as $1,000.

"Mr. McDermott: Q. That does not indicate to whom it was paid, does it? A. It don't indicate any more than I said.

"The Court: Q. It simply appears in that statement as a charge against the Clifford Banking Company? A. Yes, sir.

195 Sup.—18

"Q. And, of course, it does not show to whom it was paid? A. No, sir. . . .

"Mr. Harlan: Q. Well, now, what is the next one, Mr. Carroll, if any? A. I find on March 23, 1901, draft No. 133123 is entered on the draft register payable to the Boatmen's Bank for $2.35, with ten cents exchange. I find on the statement rendered by the Merchants-Laclede National Bank under date of March 26, 1901, 133123, $1,000 charged.

"Mr. McDermott: Q. The same state of affairs exists as to that as to the other one. You don't know to whom it was paid or anything else, Mr. Carroll? A. That is right.

"Mr. Harlan: Q. That is, the books don't show? A. The books don't show, nor the statement doesn't show. . . . .

"Mr. McDermott: We renew our objection to the introduction of any testimony concerning those two drafts, *not being connected with this case.*

"The Court: That objection will be sustained unless it is shown that the defendant received the proceeds. I do not know whether the admission that was made by Judge Krum covered these drafts or not.

"Mr. Harlan: I don't understand that it did.

"Mr. McDermott: No. We admit the notes that were introduced in evidence, that is all.

"The Court: Well, you will have to connect the defendant, of course, with these last two drafts, in some way."

The further evidence introduced, and claimed to tend to show the Donovan Commission Company got the proceeds of these two drafts, is contained in two communications in writing from the Donovan Commission Company to McQueen and produced at the trial by plaintiff. The first of these communications is as follows:

Clifford Banking Co. v. Donovan Com. Co.

"Special wires to Chicago Board of Trade, and New York Stock Exchange.

"We have no agents.

"References:    The    Third    National Bank, St. Louis; The Mechanics Bank, St. Louis; American Exchange Bank, St. Louis, and all Mercantile Agencies.

                "DONOVAN COMMISSION CO.
        "Grain, Provisions, Stocks and Cotton.
        Bought and Sold for Cash or on Margin.
                317 Pine St.
                    "St. Louis, March 18, 1901. ·
"T. S. McQueen, Esq.,
    Clarksville, Mo.

"Dear Sir:  We are in receipt of your favor of the 17th, enclosing draft for $1,000, which we have credited to your acct. with thanks.  We also thank you for your orders recd. to-day and enclose you memos. of same. We also enclose Cashrs. Check for $58.34 to take the place of our St. L. Trust Co. check which you return and note your request to have all checks  made  by Cashier or draft in future.  Same will receive our attention.

    "Awaiting your further favors, we are
                "Yours truly,
                "DONOVAN COMMISSION Co.
                    "H. G. READ, Secty."

    The second communication is as follows:
                "St. Louis, Mo. 4—6—1901.
"T. S. McQueen,                      ·
        Account Current with

| . Dr. | | Donovan Commission Co. | Cr. |
|---|---|---|---|
| "Mar. 14 | 58.34 | Dft. to Cash & M. | |
| 30 | 16.20 | Rev. Tax. | |
| 30 | 3,132.76 | Losses. | |
| | 3,207.30 | | |
| "Apr. 3 | 3,000-Loss | | |
| | "6207.30 | | |

| | | |
|---|---|---|
| "Mar. 1 | Balance | 297.93 |
| 2 | M. O. | 30 |
| 6 | M. O. | 65 |
| 18 | Dft. | 1,000 |
| 25 | Dft. | 1,000 |
| 27 | Reb. | 153.12 |
| | Gains | 661.25 |
| | | 3,207.30 |
| Apr. 1 | Dft. | 3,000 |

"6,207.30"

The symbol "Dft." was shown to mean draft, the letters "M. O." to mean money order, while the abbreviation "Reb." was not interpreted. Further referring to these communications, it will be seen that under date of March 18, 1901, the Donovan Commission Company acknowledged the receipt of a $1,000 draft, and, by reference to the first table, it will also be seen that on the 16th of March, two days before, a draft numbered 133071 was issued by McQueen. It will also be seen that by the communication dated April 6, 1901, the Donovan Commission Company credited McQueen on March 18, with a draft for $1,000, and on the 25th with another draft of like amount. By reference to the first table, it will be seen that on March 23rd a draft was issued to McQueen bearing the serial number of 133123. By reference to the testimony of the cashier, it will be seen that both No. 133123 and 133071 were charged by the Laclede Bank to the Clifford Banking Company, and, supplying data from the April communication from defendant, it appears that at about the same dates, the Donovan Commission Company credited McQueen with two drafts for $1,000 each.

Supplementing the foregoing facts with evidence that McQueen had no authority to use the funds of the bank in his own dealings and that the bank received nothing for the drafts except the trifling sums afore-

said, and tending to show they were fraudulently issued, plaintiff rested.

Whereupon defendant asked the trial court to declare the law to be as follows: "Upon the evidence adduced, the court finds that the plaintiff is not entitled to recover." The learned court refused to follow the lead suggested in this declaration of law, and defendant excepted. Thereafter, defendant standing on plaintiff's case, as said, on January 18, 1904, judgment was rendered for the sum of $11,458.35, from which defendant appealed.

The cause is submitted here by appellant's learned counsel on several assignments of error—one and all mere amplifications of the crisp and laconic grounds formulated in their motion for a new trial. Thus:

(a) The court erred in admitting incompetent evidence, over the objection of defendant.

(b) The court erred in refusing to sustain defendant's demurrer to the evidence.

(c) The finding is against the evidence and against the law.

On the foregoing facts, was the judgment right?

I. Appellant says the court erred in the admission of testimony, for that "the accounts and memoranda between the original bank and the Merchants-Laclede National Bank were incompetent evidence and should have been excluded." Attending to this assignment of error, it will be seen that when the witness was upon the stand, with the monthly statement of the Laclede Bank in his hand, he was asked what it, the paper, represented or purported to be. His answer was: "It represents the amounts received and credited by them and the amounts debited by them." At this point appellant's counsel said: "We object to this, if the court please, as being incompetent, being hearsay, as between the Merchants-Laclede Bank and this defendant." Whereat the trial judge replied: "I

think that the manner in which the accounts were kept as between these banks is competent testimony, tending to show the nature of the transaction; I overrule the objection." Defendant excepted. It will be seen, furthermore, that following that objection and that ruling, evidence was introduced that drafts numbered 133-182, 133229, 133319 and 133389, aggregating $9,000, were shown by that statement to have been cashed by the Laclede Bank. They were identified therein by number, and thereby the dates of payments by the paying bank were shown. At this point, the drafts with significant indorsements lying under the eye of the court, one of appellant's learned counsel made an admission as follows: "There will be no dispute, your honor, that the proceeds of these drafts went to the defendant company." With this admission in the case, if it were conceded, *arguendo,* that the evidence was incompetent as hearsay, i. e., that payment by the paying bank to the payee, could not be proved by the hearsay admission of the paying bank, yet appellant admitted the payment to it, it says it got the proceeds of the drafts. By this admission there was necessarily another admission made, to-wit, that the drawee, or paying bank, paid the four drafts enumerated. The fact being admitted, evidence directed to proving the fact has no office, and the question, whether it was competent or not, is in the air.

However, the other two drafts, those lost or destroyed, are to be reckoned with as they were not covered by the admission, and therefore, the nature and scope of the objection as lodged should be analyzed more closely. That objection, subject to a fair gloss, was that the evidence was incompetent as hearsay, i. e., a mere recital by a third party. But it must be self-evident that the transactions between the Laclede Bank and the Clifford Banking Company were not hearsay as that term is used in the books. They were part of the case, and, by metaphor, at least, may be deemed *res gestae,*

although defendant was not a party to those transactions. One step in plaintiff's case was to show that accounts were kept between the two banks, for only by accounts do banks commonly speak. Another allowable step was to show the method of keeping these accounts. Still another was to show that the Laclede Bank had honored the drafts; otherwise, plaintiff would not be injured. Still another step was to show that defendant had got the proceeds of the drafts; otherwise, it could not be liable. All these were separate steps and had to be taken one at a time. If the objection had been that the books of the Laclede Bank were the best and primary evidence proving any of the foregoing facts, or if it had been that the statement from which the witness testified was not shown to be a true transcript of those books, then another question would have been sprung, not now in this case. So far as we can see, the logic and scope of the objection, as made, would have been precisely the same had it been directed to the evidence of a witness who, as an officer of the Laclede Bank, knew the fact that the books of that bank were correctly kept, that they were the true history of the intricate and many details of its daily business transactions, and, as such, showed that the drafts were actually presented for payment at its counter and paid, or if the witness had presented the books showing such facts, yet it would not be contended such evidence would have been incompetent, under an objection that it was hearsay.

Keeping this in mind, it will be seen that after said admission, the witness was allowed to testify that by the monthly statement of the Laclede Bank, the two drafts, lost or destroyed, for $1,000 each, were also presented for payment and paid by the drawee, to-wit, said bank—all this without further or other objection. Finally, another learned counsel of appellant, after interrogating the witness and ascertaining that he, personally, did not know to whom these two drafts were paid,

and that the statement he held in his hand would not show that fact, lodged this objection: "We renew our objection to the introduction of any testimony *concerning those two drafts, not being connected with this case.*" In other words, the gist of the objection, though termed a renewal, was that the proceeds of the two drafts were not traced into appellant's pockets, that the evidence fell short of showing that fact, *ergo,* the drafts were not "connected with" the case. This was not an objection that the method of proof was improper, such as now made here on review. It was an objection leveled at the sufficiency of the proof. So the trial judge understood, because he ruled the objection well taken, unless it be, *aliunde,* shown that defendant received the proceeds of the drafts, and, accordingly, he ruled further that plaintiff would have to connect the defendant with the last two drafts in some way. In our opinion, appellant by this ruling got all it was entitled to under the objection, namely, that before it could be compelled to *disgorge,* it should first, by competent evidence, be shown to be *gorged.* This looks reasonable. Whether that evidence was supplied, or whether on the evidence, as supplied, appellant is liable as a matter of law, is another matter.

II.    The title of respondent to the claim in suit is assailed by the following contention in appellant's brief: "The so-called trustees, who were directors of the original bank, were without authority to transfer assets of the bank in dissolution to a new bank in payment of its capital. A bank should be wound up by the State. The trustees of a dissolved corporation have no authority to turn over its assets to a new corporation as its capital. The assignment of assets was equivalent to a general voluntary assignment and void under the statute."

In our opinion, none of the propositions asserted have merit as applied to the facts in judgment. There

is no proof that the assets of the old bank were turned over to the new bank as its capital; and if such were the case, it is elementary that the corporate integrity of the new bank could not be assailed by a debtor of the old bank, when called on to pay, by a collateral attack such as this. The matter in hand is of no concern to appellant. It was not injured thereby and the State is the proper party to complain. Nor is this a case where the affairs of the old bank should have been wound up by the State; because the bank is not shown to have been insolvent. It is not a going concern, crippled by mismanagement, but, if so crippled, would it lie in appellant's mouth to plead its own wrong, when it is being tried, practically, on a charge of aiding therein? For aught appearing on this record, the old bank has no creditors and its stockholders are settled with; at any rate, none of its stockholders or creditors lift their voices in protest. Neither does the State of Missouri complain, and appellant ought to be neither allowed nor required, with its other pending troubles, to shoulder the burden of speaking in the names of the stockholders or creditors of the old bank, or of the State of Missouri, or of carrying their duties or protecting their rights— all such questions are beside the case, and to chase after them would be but to be led off by a *ruse de guerre*, so to speak, into byways and hedges, and lose the main-traveled road to ultimate justice. The only legal concern appellant may have, in the matter now under consideration, is to be not vexed twice over the same matter—that it may pay to the right party, if pay it must. The humor of the situation (if an appellate court may be allowed to indulge or express a sense of humor—on which there is some doubt) is that appellant's learned counsel do not contend here their client wants to pay *once*, and may be in danger of paying *twice*— the burden of their insistence is that it be not compelled to pay at all. On this score, it may be said that the record shows the new bank assumed all the liabilities of

the old, and this in consideration of the transfer of this claim, with other assets. Now, for aught appearing here (and presumably) the new bank has responded in full to the letter of its bond, and, on the record before us, we hold it has a perfect title to the claim in suit as against the whole world. The statutes to which we are alone referred by appellant to support its contention (R. S. 1899, secs. 976, 1305 and 1306), have no application to a bank in the condition of the old bank, and, therefore, lend no substantial aid to the position assumed by appellant.

III. Appellant lays down the following propositions of fact and law and invokes their help, viz.: "Appellant, as well as the putative assignor of the respondent, was innocent in the premises. Where one of two who are innocent must suffer, the loss must fall on him who afforded the opportunity for the wrong. Had not the original bank been remiss and grossly negligent, the loss would not have occurred." And to sustain these contentions we are cited to Bank v. Armstrong, 62 Mo. 67, and Neuhoff v. O'Reilly, 93 Mo. 164. As to the propositions of law announced, they may be conceded; for, in either cutting the Gordian knots in which men's affairs tie themselves, or in softly untying knots, not Gordian, courts make use of of the ethical principle that where one of two good men stands to lose, he should lose who opened the door for loss to enter. But this principle seeks its application to cases pertaining to negotiable instruments, in protecting an innocent purchaser, not otherwise. The rule and its application are guardedly and neatly set down in Bank v. Armstrong, supra, thus:

"It is true there is a certain class of cases, where a party to a negotiable instrument permits it to be so loosely drawn as to render the addition of words enlarging its liability a matter of comparative ease; and (if) such instrument is negotiated before maturity, to

an innocent purchaser for value, the maker will be held bound by the alteration, although fraudulently made, if made in such a manner as not to place a man of ordinary prudence on the alert; as, for instance, where the blank for the sum to be inserted is not completely filled by the sum there inserted, but space is left for the easy addition of other words, in a manner not provoking attention. This rule prevails in accordance with the maxim, a sound one alike in ethics as in law: 'that where one of two innocent parties must suffer, that party must be the sufferer who gave occasion to the commission of the wrong.' "

In Bank v. Bank, 71 Mo. 183, the same principle was applied to non-negotiable certificates of deposit indorsed in blank; the cases were critically examined in a most trenchant and scholarly opinion by NAPTON, J., and the law may be taken as settled. But, as will be seen in the quoted extract from Bank v. Armstrong, the party invoking the doctrine must be an innocent party, i. e., a party who holds the paper bona fide and for value. It is at this precise point, innocency, the battle is pitched. Appellant says it was an innocent purchaser for value. If this be true, then the law accords it protection, because it cannot be gainsaid that in leaving signed drafts lie about loose, subject to be fraudulently filled in at the wrongful instance of an employee, and uttered and thus become commercial couriers without luggage, the assignor of respondent was remiss. And if a draft so issued with an honest face, i. .e., without any *indicia* of fraud, had come into the possession of an honest holder for value, its face would have been its passport, and respondent, standing in the shoes of the old bank, must pocket its loss with such corporate grace as it can command. But the mischief in appellant's position is that it *assumes* its innocence —it begs the question. We are not called upon to say whether it is innocent or not. Its letterhead shows, *inter alia*, it dealt in "margins." The body of the letter

in evidence indicates that McQueen had adopted a plan of obliqueness in remittances to him, a plan calculated to throw an observer off his trail, a plan to conceal his dealings with appellant by having his gains sent him through cashier's checks, or drafts, and not by appellant's own telltale checks, which plan appellant graciously winked at, thus: "We . . . note your request to have all checks made by cashier or draft in future. Same will receive our attention." So, too, the accounts rendered by appellant to McQueen show no actual dealings in actual products or commodities. The matter is summed up, by appellant's own choice of words, in mere "gains" and "losses"—the very language of option gambling. So that, with appellant laying its hand over its mouth, standing mute, if we were called upon to decide its innocence in its astonishing dealings with a clerk of the Clifford Banking Company, whereby eleven thousand dollars of the bank's money, as shown by the very drafts themselves, speaking through its officer, the cashier, were poured into its coffers in thirty-nine days, and lost as water poured upon sand, we might draw inferences of fact unfavorable to appellant— inferences bringing the dealings of McQueen and appellant under the ban denounced by the law against option dealing, struck at by Revised Statutes 1899, sections 2337 to 2345, inclusive. But this is not necessary, because, in the state of the existing proof, the burden was cast upon appellant to show its innocence, i. e., that it was a purchaser or holder for value and in good faith, and that burden it, of set purpose, threw off.

Before dealing with the law on the phase of the case now up, it may be well to dispose of a question of fact relating to the two lost or destroyed drafts for $1,000 each. It will be seen that as to the other drafts, aggregating $9,000, appellant admits receiving their proceeds, which is tantamount to an admission of their reception, presentation to the drawee, and payment. It

is our own opinion that all the drafts stand on the same
foot, that is, as to four of them, payment is admitted; as
to the remaining two, payment was proved.  And this
is so because respondent showed that appellant received
two drafts of $1,000 each from McQueen and credited
McQueen with the proceeds so closely after the corres-
ponding dates on the draft register as to create a rea-
sonable inference they are the identical drafts.    The
credits indicated the drafts had been cashed.    The
course of dealings between McQueen and appellant in-
dicated appellant was the payee.  All the drafts had
said Laclede Bank lithographed thereon as drawee.  It
is fairly inferable, therefore, that if these drafts were
cashed, they could only have been cashed by the drawee
on presentation by the payee or its indorsee and thus
a prima facie case was made by respondent.  In this
condition of the proof, we hold the burden shifted to
appellant to rebut these inferences, and this under the
rule that if the inferences were not true, the facts show-
ing their falsity rested peculiarly within the knowledge
of appellant, and hence, should have been produced by
it.. [Richardson v. Drug Co., 92 Mo. App. 1. c. 534.]
We hold, therefore, all the drafts are shown to have
been received and cashed by appellant.

Coming back, then, to the principles of law equally
applicable to all the drafts and decisive of the question
now under consideration, the settled doctrine is this:
if a check or bill of exchange or other commercial paper
is shown to have originated in a fraud perpetrated
against the maker, then the burden shifts upon the
holder to show that he holds for value without notice
of the fraud.  [Keim v. Vette, 167 Mo. 1. c. 399, and
cases cited; Famous Shoe and Clothing Co. v. Cross-
white, 124 Mo. 1. c. 39.]    In the case at bar, the
bills originated in a fraud of a peculiarly hei-
nous character, to-wit, forgery in the third de-
gree.  [State v. Kroeger, 47 Mo. 552.]  Forgery hav-
ing been proved, the uttering of the forged paper hav-

ing been shown and its reception and use by appellant being in proof, appellant was no longer in a situation where silence was safe under any recognized principle of law, or ethics, unless the contention presently to be considered be resolved in its favor.

IV. The other insistences of appellant may be briefly summed up in the propositions that the relation between the old bank and the Laclede Bank was that of creditor and debtor; that the deposits of the old bank were simple loans to the Laclede Bank; and that when appellant received the proceeds of the drafts, it received the money of the Laclede Bank and not of the old bank, and hence respondent's cause of action is against the Laclede Bank and not against it. And, furthermore, there being no claim of the old bank against appellant, nothing passed by the assignment of the old bank to the new bank.

Let us examine these propositions for substance. Under the general law-merchant a drawee of a bill was, possibly, only held to a knowledge of the signature of his correspondent, the drawer; and by accepting and paying the bill, he only vouched for the genuineness of such signature and was not held to a knowledge of the want of genuineness of any other parts of the instrument or the title of the holder. [White v. Bank, 64 N. Y. l. c. 320.] The doctrine obtaining in this State should be stated more guardedly, in that a drawee of a bill should look to the signature of the drawer and may not escape responsibility by ignoring other parts of its face. In other words, such *indicia* of alterations, erasures, etc., as would impart notice to a reasonably alert person may not be ignored. There is no evidence that the bills in the case at bar were not paid by the drawee in the usual course of business, or that they were marked with any irregularities on their face. The signature of the drawer was confessedly genuine. In such condition of things, it is hornbook law that the Clifford

Banking Company could not recover from the Laclede Bank. To the facts in proof, the principle invoked by appellant that where one of two innocent persons must suffer, he who afforded the opportunity for the wrong must bear the loss, would be precisely applicable. If we view the case from another standpoint by indulging the hypothesis that the Laclede Bank sued appellant, how would that case stand? In that case the Laclede Bank would not have been injured, inasmuch as it had neither voluntarily recouped to the old bank its loss, nor, under the facts before us, would an action seem to lie in favor of the old bank against it. While it is not necessary for us to decide that such condition of things bars recovery, yet obviously, serious, if not insurmountable, obstacles existed in the road. So that, if appellant's contention be allowed and followed to its logical sequence, the case stands this way: respondent's assignor was a creditor of the Laclede Bank. That bank was not liable, because of the negligence of such assignor. Appellant got the money of the Laclede Bank. It was not liable to that bank because the bank was not injured. Hence, the case is at an end. If this be so, then, at least a part of the old Hudibrastic couplet, to-wit,

> He ran in debt by disputation,
> And paid with ratiocination,

is true, for while the debt, so to speak, was not created by disputation, it certainly is being paid by nimbleness and refinement of reasoning.

The vice in appellant's contention consists in the fact that while, in a sense, the old bank was the creditor of the Laclede Bank, and while, in a sense, the money (the proceeds of the drafts) was the property of the Laclede Bank, yet, in another sense, the fund on deposit was the property of the old bank held subject to its order, and the bills drawn in this instance represented and appropriated that fund *pro tanto,* and, when cashed, diminished the assets of the old bank to the extent of

their face values. These bills of exchange were representatives of property belonging to the old bank, stood as that property, and, in the eye of the law, were that property, represented value, and appellant was not entitled to the bills nor the property, for which they stood, except it; with clean hands, paid value therefor. It will not be necessary to cite authority to sustain the proposition that negotiable instruments and certain forms of non-negotiable instruments, though at bottom mere paper evidences of debt or title to property, are, for the practical purposes of the law, and in the transaction of business, treated as property itself.

V. The action for money had and received has always been one favored in the law and the tendency is to widen its scope—it being a flexible form of action, levying tribute on equitable, as well as strictly legal doctrines; so that, it has become axiomatic that the action lies where ''the defendant has received or obtained possession of the money of the plaintiff, which, in equity and good conscience, he ought to pay over to the plaintiff.'' [2 Greenleaf on Ev. ( 16 Ed.), sec. 117.] The same author says (sec. 118) : ''In regard to *things treated as money,* it has been held that this count may be supported by evidence of the defendant's receipt of bank notes; or promissory notes; or credit in account, in the books of a third person; or a mortgage, assigned to the defendant as collateral security, and afterwards foreclosed and bought in by him; or a note payable in specific articles; or any chattel.''

In Wilson v. Turner, 164 Ill. l. c. 403 (Mr. Justice CRAIG delivering the opinion of the court), it was said: ''An action for money had and received will lie whenever one person has received money which, in justice, belongs to another, and which, in justice and right, should be returned. In Allen v. Stenger, 74 Ill. 119, in discussing this question, the court said (p. 121) : 'Assumpsit always lies to recover money due on simple

contract.  And this kind of equitable action to recover
back money which ought not, in justice, to be kept, is
very beneficial, and therefore much encouraged.  It
lies only for money which, *ex aequo et bono,* the defend-
ant ought to refund. [Chitty on Contracts, 474.] When,
therefore, according to this rule, one person obtains the
money of another which it is inequitable or unjust for
him to retain, the person entitled to it may maintain
an action for money had and received for its recovery.
And it is not necessary that there should be an express
promise, as the law implies a promise.  The scope of
the action has been enlarged until it embraces a great
variety of cases, the usual test being, does the money,
in justice, belong to the plaintiff, and has the defend-
ant received the money, and should he, in justice and
right, return it to the plaintiff?' "

It is not necessary to allege a promise to pay, nor
is privity of contract required.  The law implies the
privity.  [Tamm v. Kellogg, 49 Mo. 118.]  In this be-
half, the language of PARKER, C. J., in Hall v. Marston,
17 Mass. 574, quoted approvingly by GOODE, J., in Rich-
ardson v. Drug Co., 92 Mo. App., supra, is to the point,
thus: "There are many cases in which that action is sup-
ported [assumpsit for money had and received] without
any privity between the parties other than what is cre-
ated by law.  Whenever one man has in his hands the
money of another, which he ought to pay over, he is
liable to this action, although he has never seen or
heard of the party who has the right.  When the fact is
proved that he has the money, if he cannot show that
he has legal or equitable ground for retaining it, the
law creates the privity and the promise."

On principle there is no reason apparent to us why
a constructive trust in favor of respondent does not
exist in this case under the rule announced by Mr.
Perry (1 Perry on Trusts [5 Ed.], sec. 211), as follows:
"So property obtained by one through the fraudulent

practices of a third person will be held under a constructive trust for the person defrauded, though the person receiving the benefit is innocent of collusion. If such person accepts the property, he adopts the means by which it was procured; or, as Lord Ch. Justice WILMOT said, 'Let the hand receiving the gift be ever so chaste, yet if it comes through a polluted channel, the obligation of restitution will follow it.' This principle of course cannot prevail against a purchaser in good faith for a valuable consideration, and without notice of any fraudulent influences." [See, also, 3 Pom. Eq. (3 Ed.), sec. 1047.]

Nor can we see any good reason why in this form of action, where the petition partakes of the nature of a bill of equity, the action may not lie to reach money held under a constructive trust.

The industrious counsel for respondent have collected many authorities in point which will be found cited in their brief and will appear in connection with this opinion.

The judgment is for the right party, and is, therefore, affirmed.

All concur.