**KANSAS CITY ASSEMBLAGE COMPANY,**
**Plaintiff-Respondent,**

v.

**Albert R. LEA, Defendant-Appellant.**

No. 24445.

Kansas City Court of Appeals.

Missouri.

June 6, 1966.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 29, 1966.

Ray D. Jones, Jr., Kansas City, for appellant.

Roger Guffey, Fallon, Guffey & Jenkins, Kansas City, for respondent.

BLAIR, Judge.

This action was commenced by Kansas City Assemblage Company, a corporation, against Albert R. Lea on July 3, 1961. The relevant averments of the petition were that Albert R. Lea was an employee of the Assemblage Company and that "during said employment, and specifically and continuously from January 1, 1951 through and including December 31, 1958, defendant used and converted funds of plaintiff corporation to his own use by paying personal debts and expenses with plaintiff's funds from time to time in the total amount of $4,540.29" and that on January 24, 1961 the Assemblage Company "made demand on the defendant for repayment of said sum" and that he failed and refused to pay. By his answer the defendant denied that he had wrongfully converted any funds of plaintiff corporation to his own use and alleged that the petition failed to state a cause of action for the reason that "it is barred by the statute of limitations in that the suit was filed July 1, 1961 for claims alleged in 1951 and 1952."

The trial was before the court without a jury. The court found (1) "that by mutual agreement plaintiff for business purposes paid $1224.00 for membership in the Mission Hills Country Club which was held in the name of defendant:" that "this membership could not be transferred to the plaintiff corporation when defendant severed his connection with plaintiff and was therefore retained in defendant's name;" that "defendant, having elected to retain said membership, is indebted to the plaintiff for the cost thereof;" and (2) "that the defendant did not wrongfully convert any funds of plaintiff to his own use." Judgment was accordingly rendered for the Assemblage Company and against Lea in the sum of $1224.00 and the costs were taxed equally against the parties. Lea appeals from the judgment against him in the sum of $1224.00 and Assemblage Company appeals from the judgment against it that Lea "did not wrongfully convert any of the funds of the corporation to his own use," contending that it should have had judgment for an additional $1996.29 for funds it claims were converted by Lea.

We must review this controversy upon both the law and the evidence as in suits of an equitable nature. Neither judgment will be set aside unless it is clearly erroneous. Due regard must be given by us to the opportunity of the trial court to judge the credibility of the witnesses. However, if our review of the case forces the conclusion that either judgment is clearly erroneous, we will not hesitate to set aside that judgment and to direct a different one. Civil Rule 73.01(a), V.A.M.R.; Hanover Insurance Co. v. Abschal, Mo.App., 375 S.W.2d 605, 609; M.F.A. Mut. Ins. Co. v. Alexander, Mo.App., 361 S.W.2d 171, 178. We deal first with Lea's appeal.

The Assemblage Company is a family corporation. Mrs. Winona Gilkey was at all times the controlling stockholder, its president, its alter ego and almost its sole owner. Prior to 1947 an insignificant number of shares had been issued to her two daughters and her son. In 1947 Lea became associated with the Assemblage Company as its vice-president and general manager. His wife was a daughter of Mrs. Gilkey. Three hundred sixty shares of stock were issued to Lea. On April 27, 1951, Lea joined Mission Hills Country Club and the company paid for his membership, $1224.00. At the trial, Mrs. Gilkey testified as follows: "Q Let me ask you, on April 27, 1951, were you aware that Mr. Albert Lea joined Mission Hills Country Club, and were you aware at that time that the corporation, Kansas City Assemblage Company, paid his membership fee? A Yes, I was aware of that. Q You were aware of that fact? A Yes. Q Did you object at that time to the fact that the corporation paid Mr. Albert Lea's membership to that club? A *No, because we wanted to help out."* Prior to the trial, Mrs. Gilkey gave testimony by deposition which was read to her at the trial and which she acknowledged to be correct. Her testimony was that she and Lea discussed the purchase of the Mission Hills Country Club membership before it was purchased. She stated "Well, he just said he was going to do it (purchase the membership) and would it be all right, and I said 'Yes, Go ahead.'" She admitted she told Lea in that discussion that it was all right for the corporation to pay for the membership. She said she was aware of the fact that thereafter on April 27, 1951, the corporation paid for that membership.

■ After the purchase of the membership Lea used it to entertain customers and prospects of the company and he and his wife used it for social purposes. He always paid the club dues with his own personal funds. The membership was nontransferable and no one claimed that the company and its officers were not aware that it was impossible for Lea to transfer it back to the company or to any one else once it was placed in his name. There is nothing in the testimony of Mrs. Gilkey establishing that Lea agreed at any time, expressly or tacitly, to repay the company for the membership. She did not even testify that she *expected* repayment when the membership was purchased. She was asked if any demand had been made on Lea to "return any of these funds to the corporation" before January 24, 1961, and she answered "I think every year this was done." She thought the Certified Public Accountant, Mr. Harry Kuehn, who supervised and adjusted the bookkeeping for the company, "did look it (Lea's account) over." The intimation conveyed was that Kuehn did demand repayment by Lea each year. She did not testify that she had any direct knowledge that this was done. She stated that Mr. Kuehn would know how much Lea was indebted to the company. Oddly enough, Mr. Kuehn was not called as a witness and no attempt was made to account for his absence. The inference is allowable that testimony from him would have damaged rather than aided the company's cause. Her final testimony almost at the end of the trial was that she did not "remember" if she ever demanded payment from Lea for the membership until January 24, 1961, after Lea had been discharged from the company on December 31, 1958, and after he and his wife, her daughter, were divorced in 1960.

Adah M. Sturgeon, the bookkeeper for the company, testified for the company that although the membership was purchased on April 27, 1951, no entry was made in the books until June 30, 1951. She made an entry on that date in the ledger from the check written to Mission Hills Country Club in payment for the membership. That entry was: "Mission Hills Country Club" for the sum of $1224.00. No other entry was ever made and thereafter this entry was always carried in the ledger as written. She testified this entry was carried in the ledger as "a club expense." She repeatedly testified under the most insistent and repetitious examination that the membership was never

carried on any of the books as an account receivable from Lea or as an indebtedness of Lea to the company. Illustratively, and this is only one of several similar examples of her testimony, she testified as follows: "Q Did you, as the bookkeeper, treat that transaction of Mission Hills at that time as a debt or gift? The Court: I think we have covered that. It is on the books as a club membership. Q Did you put it on the books as a club membership? A Yes, sir." Counsel representing the company did not then or at any other time raise any objection that the statement of the court was an inaccuracy. Miss Sturgeon's testimony on the entire subject of the membership was always explicit, unequivocal and as we have recited it. It stood unchanged and unshaken at the end of the trial. She knew nothing of the arrangement between Mrs. Gilkey and Lea when the membership was discussed and later purchased and paid for by the company. She simply made the entry in the ledger at the direction of Mr. Harry Kuehn, the C.P.A.

Earl C. Padgett, the son of Mrs. Gilkey, testified that he became associated with the company in December, 1960, as general manager and that on January 24, 1961, through his attorney, he made demand on Lea "for a return of funds then due and owing the corporation." He was asked where he obtained his information that Lea was "indebted to the corporation" and his answer was "from the company books". He was asked if any journal entry in the books showed that Lea was "indebted to the company" for the membership. He stated that he knew of no such entry. He was asked if "any records in the books" indicated that the membership was "carried in the corporation accounts as an account payable from Mr. Lea to the corporation, or as a note payable to the corporation, or as a debt of any kind to the corporation?" The court said: "If he knows of any entries in the books, he may show the entry." He did not show any such entry or testify that any existed. He was one of the persons who "caused this law suit to be filed against Mr.

Lea". This is the substance of all of his testimony which is relevant to the membership.

Albert Lea testified that he joined the Mission Hills Country Club at the urging of Mrs. Gilkey and his wife, Mrs. Gilkey's daughter, "for business and personal reasons and my standing in the community." The membership was given to him as a bonus. Mrs. Gilkey fixed all salaries and bonuses paid by the company, including Lea's and her own. Lea stated that he believed the books would bear out that for 1951 he was allowed a bonus equal to one-half of the bonus Mrs. Gilkey allowed herself and that his bonus was diminished by the cost of the membership. He stated he was not familiar with the books and that they were handled by Mr. Kuehn and Miss Sturgeon. The books for 1951 did not support his belief that he drew only half as much bonus as Mrs. Gilkey. That year she allowed herself no bonus. She allowed Lea a $3,500.00 bonus. What the books did not show was whether Mrs. Gilkey, in calculating Lea's bonus, diminished it by the cost of the membership. It is not argued to us that they do show that she did not decrease his bonus to that extent. Counsel for the company in their brief say that Mrs. Gilkey "denied any knowledge of an agreement whereby the defendant was to receive a yearly bonus equal to one-half of any bonus received by her as president and *specifically* denied that the club membership was transferred to the defendant as a part of his bonus for the year 1951" and cite us to the record. The record does not support this statement. Her testimony was as follows: "Q You heard Mr. Lea in court here testify that you received a bonus and he received a bonus in 1951 and that part of his bonus was the membership in the Mission Hills Country Club. Is that true or not true? A I don't remember any of that." She finally stated that she thought the books would reflect such a transaction if it occurred but said "I am not too familiar with the books. Really, I am not." Mrs. Gilkey did not deny that she agreed with Lea that

the cost of the membership was to be charged against any bonus she allowed him for 1951 and she did not deny that she diminished his bonus to that extent. She would only say she did not remember. We see nothing in the testimony of either Mrs. Gilkey or Lea on this subject that aids the company's case or impairs Lea's credibility.

After the books were produced, Lea acknowledged that he was mistaken about the proportions between the bonus paid Mrs. Gilkey and him. He explained that she was regularly drawing large sums of money out of the corporation during 1951 and other years, and that was the reason she drew no bonus in 1951. It must be remembered always that Lea was testifying in April of 1965, after having been discharged from the company on December 31, 1958, about what he thought from memory the books would show about the bonuses for 1951. After the lapse of 14 years, and more than four years after he left the company, we believe he could easily have been honestly mistaken about the proportions between the bonuses which Mrs. Gilkey allowed herself and him for 1951. We believe he was only mistaken and that his mistake was an honest one. We have devoted much study to the testimony of Mrs. Gilkey and Lea. And we do not believe that Lea was mistaken when he said that the membership was to be paid for from his bonus. We do not believe he was lying. As an intelligent man, if he wanted to lie, he could simply have testified that Mrs. Gilkey gave him the membership without any strings attached. To us the story he told carried the ring of honesty and truth.

On the other hand, there is much in Mrs. Gilkey's testimony that does not carry the ring of truth. Her statement "I don't remember any of that" in response to Lea's testimony is not convincing to us. She attempted to bolster it by professing an amazing ignorance of the affairs and books of the company and by insisting that she had little understanding of them. This does not ring true as testimony from the controlling stockholder of the company, its president,

alter ego and almost sole owner. Actually there was convincing testimony that she and the C.P.A. together went over the books of the company each year "with a fine tooth comb" and we believe this is true. It is unbelievable that she had so little knowledge of this prosperous and profitable company. Her failure to "remember" whether she ever demanded of Lea that he repay the company for the club membership until almost 10 years after it was purchased is to us incredible. This whole record gives us the settled impression that she was the kind of woman who would remember debts owed the company and the evidence was that she wanted them settled at the end of each fiscal year. She regularly went over the books and settled her own debts to the company at the end of each fiscal year. We believe that she would have made demand on Lea long before 1961 for payment for the membership purchased in 1951 if she thought anything was due from him.

■ Lea and her daughter were divorced in 1960 and we believe that this more than likely was a strong reason for the impairment of Mrs. Gilkey's memory and this claim against Lea. On cross-examination she was asked if she did not carry "an intense hatred" for Lea. An objection to this question specifying no ground was made and the court sustained it, excluding from the record this competent and vital information concerning her feeling toward Lea. Certainly we do not need to cite authority that this ruling was wrong. We are entitled to assume that if she had been permitted to answer this question truthfully her feeling toward Lea would have been elicited and that it would have discredited her professed lack of memory and her weak testimony. We can place no other interpretation on the refusal of her counsel to let her answer a question so palpably relevant.

■ Beyond what we have said already, counsel for Lea tried twice, while cross-examining Mrs. Gilkey, to develop that in October of 1960 Lea had turned over all

of his stock in the company to her in full settlement of all obligations the company might then be claiming against him. An objection was made that an answer to the question would not be relevant to any issues in the case. It was sustained. Counsel for Lea then stated to the court: "I would like to make the following offer. That in October, 1960, Mr. Lea entered into a property settlement with Joyce P. Lea, his wife. At that time the attorneys were Mr. Koontz for Mrs. Joyce Lea and Mr. Gentry was attorney for Mr. Albert Lea. As a part of the settlement Mr. Lea, in paragraph 5, transferred and assigned to Winona Padgett (Gilkey) 360 shares of stock in Kansas City Assemblage Company which had a book value at that time of $24.21, and we are prepared to testify the true value was somewhere in the neighborhood of $50,000.00 at that time. We urge this evidence before the court for the reason that this involved a complete settlement at that time between the corporation, Mrs. Lea, Mrs. Winona Padgett (Gilkey), here, and Mr. Lea as to any possible obligations at that time owing between these parties, and we further offer it to show that at that time it never occurred to this person (Mrs. Gilkey) that Mr. Lea was indebted to this corporation." The court refused the offer. Counsel for Lea then asked the court to take the testimony and then exclude it, if the court adhered to its ruling, so that it would be in the record and this was refused. The court said: "Now, you can make offers in connection with *your* defense and if it is pertinent we will hear it." Later counsel again made a similar offer to prove the same settlement by Mrs. Gilkey and the offer was again refused. Evidently the court believed that Lea could try to establish the settlement by his own testimony or by other witnesses but not by Mrs. Gilkey. Finally, his counsel did manage to work in one question to her: "Q Did you make a full settlement with Mr. Lea at that time (October of 1960) as to all obligations he owed you?" Mrs. Gilkey answered: "No", and that was as far as counsel for Lea was permitted to examine her on this subject.

Considering the manner in which the parties were trying the case, these offers were erroneously refused for they related to a settlement that would be a complete defense to the company's claims against Lea, including the club membership and all monies claimed from Lea in this case.

■ While the offer of proof was erroneously excluded, it was complete and full, and since we review this case as one of an equitable nature, we are at liberty to consider the offer just as though the evidence had been admitted by the court. Zorensky v. Wellston Clothing Co., Mo.App., 223 S.W.2d 851, 855. This we do. The findings of a trial court in a non-jury case lose weight when material evidence is excluded or not given consideration. Allison v. Mildred, Mo., 307 S.W.2d 447, 453.

Lea later was allowed to testify in his own behalf that there had been such a complete and final settlement of all of his obligations to the company in 1960 in consideration for his transfer of his 360 shares of stock in the company to Mrs. Gilkey. He stated that at the time of the settlement no mention was made of any debt due the corporation from him for the club membership, and indeed that there was no suggestion that any of the claims involved in this suit even existed. He flatly stated that he would not have transferred the stock if there had been any intimation that he was later to be charged with bearing the company any obligation at all. Again his testimony strikes us as being reasonable and truthful.

■ Viewing the offers of proof wrongfully excluded and giving them weight, the weakening effect their exclusion has on the trial court's finding against Lea, the palpable weakness and implausability of the testimony of Mrs. Gilkey and of the company's whole case, the failure of the company to produce Harry Kuehn, the C.P.A., as a witness or to explain his absence, and the candid and persuasive testimony of Lea which we believe, we are forced to the conclusion that the trial court's

finding that Lea was indebted to the company for the club membership was plainly not supported by credible evidence and was clearly erroneous from any factual or legal standpoint. For, looking at this controversy from all sides, and giving due deference to the opportunity of the trial court to judge the credibility of the witnesses, we still cannot escape the conclusion that the membership was given to Lea as a bonus in 1951 in friendlier and happier times and that the emergence on January 24, 1961 of the claim that he was indebted to the company for it was an afterthought engendered by malice. Although we entertain the highest respect for the ability and perspicacity of the learned trial judge, "the obligation of due deference does not permit us to yield our own firm convictions because another tribunal possessed of an equal sense of justice may have found differently upon the same facts" and this is true even though the evidence is conflicting. Tebbe v. Tebbe, 223 Mo.App. 1106, 21 S.W.2d 915, 918. "If a careful consideration of all the evidence convinces us that a wrong decision has been made, we must not follow the easy way and affirm the judgment." McBee v. Twin City Fire Ins. Co., 241 Mo.App. 404, 238 S.W.2d 685, 688; Wyler Watch Agency v. Hooker, Mo. App., 280 S.W.2d 849, 855. We must follow our duty and set the judgment aside.

We consider the company's appeal which contends the trial court erroneously refused it an additional judgment for $1996.29. Miss Sturgeon, the bookkeeper, testified that the books showed that through 1951 to 1959 charges were made on the books for gasoline and repairs for Lea's wife's car. Altogether and over the years they amounted to the sum the company claims. She stated that all of these charges originally were carried as "company car" expenses. Later, Mr. Kuehn, the C.P.A., "journal-entried" these charges off and caused the books to show them to be charges against Lea personally. She did not testify why the C.P.A. changed the charges and no other witness shed any light on this subject. She did say the C.P.A. questioned them but she did not say why. Again we notice that the C.P.A. was not called as a witness for the company and that no attempt was made to account for his absence. We believe he could have given information valuable to the solution of this controversy. We have a right to infer that it would have been injurious to the company's cause.

Lea denied that he owed the company for anything. He said he had paid all of his obligations to it. Explaining these charges, he testified that he often used his own car and his wife's car on the company's business because Mrs. Gilkey was absent from Kansas City for long intervals and she took the only company car with her for her own personal use. The company's business required an available car. The inference is plain that these car expenses were incurred while his wife's car or his own car was in use on the company's business. There is no evidence that Lea ever agreed to accept these charges as his personal debt. On the contrary, he testified that he was never told by Mrs. Gilkey or any one else that they were owing to the company from him until January 24, 1961, after he had left the company, had made a final settlement with it and had been divorced from Mrs. Gilkey's daughter. He said no one ever asked him for "one dime" until after the occurrence of all of these events. Mrs. Gilkey testified that she did not "remember" making any demand on Lea for these charges "at any time prior to 1961". Yet the evidence is convincing that she was always concerned to know how the company's money was being spent and checked thoroughly with the C.P.A. to inform herself. The offers of proof made by Lea's counsel which we have set out in our discussion of his appeal also applied to these charges. As we have stated, they were refused by the trial court. We have a right to consider them here as though the evidence offered had been admitted by the court and we do.

■ Lea testified that he transferred his 360 shares of stock in the company to

Mrs. Gilkey in complete settlement of all charges the company might ever claim against him, including these of course, and that he would not have made the transfer if he thought any claim was to be made in the future. We believe he told the truth. It would have been at war with every motive of his own self-interest for him to relinquish all of his stock in the company, asserted to be worth $50,000.00 and knowingly to leave himself open to any claim Mrs. Gilkey might choose to make against him in the future. People in control of their senses just do not act that way, especially when they have just gone through a divorce proceeding with the daughter of the woman with whom they are settling. What we have said in summing up the weaknesses of the company's case in discussing Lea's appeal applies with equal force to the company's appeal. Its cause is weak and implausible and it strains credulity much too far. All in all, we are convinced that here again is the result of raking among old ashes in search for an ember still glowing enough to burn Lea. We have no hesitancy in declaring the search a failure. The judgment of the trial court against the company and for Lea was clearly right.

We have analyzed all of the authorities cited by the company on both appeals. Clifford Banking Co. v. Donovan Commission Co., 195 Mo. 262, 94 S.W. 527; Brink v. Kansas City, 355 Mo. 860, 198 S.W.2d 710; Lively v. Ridgewood Construction Corporation, Mo.App., 371 S.W.2d 658; Webster v. Sterling Finance Co., 351 Mo. 754, 173 S.W.2d 928; In re: De Gheest's Estate, 360 Mo. 1002, 232 S.W.2d 378; Murray v. Murray, Mo., 293 S.W.2d 436. We acknowledge the validity of the principles they enunciate. Sufficient it is to say that, added all together, they could not possibly warrant different decisions than we have made on the record before us.

Accordingly, this judgment against the company and for Lea is affirmed and the judgment against Lea and for the company is reversed. This cause is remanded to the trial court with the direction to enter our judgments for Lea and against the company on all issues presented by both appeals.

All concur.