Louis **WALLACH**, Mollie Wallach, his wife, Shirley Kash and Richard Wallach, Respondents,

v.

Jack **JOSEPH** and Harold Friedman, Appellants.

No. 51513.

Supreme Court of Missouri, Division No. 2.

May 8, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied June 12, 1967.

Certiorari Denied Nov. 13, 1967.

See 88 S.Ct. 335.

Stephen A. Boggiano, Boggiano & Hessel, St. Louis, for respondents.

David K. Breed, St. Louis, for appellants.

DONNELLY, Judge.

This is a suit in equity involving title to real estate located on Lucas and Hunt Road in St. Louis County, Missouri.

On January 16, 1961, plaintiffs Louis Wallach and Mollie Wallach signed a Receipt for Earnest Money, which acknowledged receipt of the sum of $7,100 from defendant Harold Friedman as earnest money and part payment on purchase of the real estate, "which property is this day sold to Harold Friedman, his successors or assigns for the total sum of Sixty-nine

Thousand and no/100 ($69,000.00) Dollars." On March 9, 1961, plaintiffs Louis Wallach and Mollie Wallach signed a Warranty Deed naming defendant Jack Joseph as grantee. At the time these documents were executed, the real estate was incumbered by a first deed of trust and a second deed of trust. On November 20, 1962, Louis Wallach and Mollie Wallach conveyed by quitclaim deed to plaintiff Shirley Kash as straw party for plaintiff Richard Wallach. Shirley Kash is a sister of Louis and Richard Wallach.

Plaintiffs brought this suit against defendants to determine title, to reform or set aside the instruments dated January 16, 1961, and March 9, 1961, and to cancel defendants' asserted interests in the real estate. The trial court decreed Richard Wallach to be the owner in fee simple of the real estate and found defendants have no title or interest therein. The trial court in its decree gave defendant Harold Friedman credit for payments and improvements made by him, restoring the parties to their original positions. Defendants appealed to this Court.

The facts are complicated and we shall recite only those which bear on the issues raised on appeal. Prior to the transaction in question, title to the real estate was in Louis Wallach and Mollie Wallach. In January, 1961, Louis Wallach, who operated a salvage yard on the premises, found himself in financial trouble. He was in default on the first deed of trust. Friedman came to see Louis Wallach and they discussed a disposition of the real estate.

According to Louis Wallach, they entered into an oral agreement whereby Friedman was to pay $2,737.14 to avoid foreclosure on the first deed of trust, pay in full an indebtedness of $10,000 secured by the second deed of trust, and advance $10,000 for working capital. He testified that a corporation was to be formed to take title to the real estate, with each owning one-half of the capital stock.

According to Friedman, no such oral agreement existed. He testified that there was no agreement for the formation of a corporation to be equally owned by the parties, and that the transaction was an outright sale as evidenced by the Receipt for Earnest Money and Warranty Deed.

There is an irreconcilable conflict in the evidence as between Louis Wallach and Harold Friedman. Therefore, the testimony of William J. Becker, a practicing attorney in Clayton, Missouri, is important. His testimony on direct examination, in part, is as follows: "Q Did you ever have occasion to meet with Mr. Louis Wallach and Mr. Harold Friedman in connection with this transaction? A Yes, sir. * * * Q Will you tell us what matters were discussed in your office at that time? * * * A Wallach I believe was there first waiting and then Mr. Friedman came in and my recollection is that he had with him an earnest money agreement dated that day, no, I take that back, that was prepared at least in part in my office and they stated that because Mr. Wallach was unable to raise the necessary payment to meet the first mortgage payment at the time and the taxes were delinquent and there was a, one judgment that was a lien on the property outstanding and Wallach run out of cash, operating capital, that he had entered into an agreement with Mr. Friedman whereby they would become partners in this used car parts business or salvage business as it is so-called and that they would transfer the property to a corporation to be formed by them, that Mr. Friedman would furnish the necessary money to pay off or pay up the current taxes and he would make the payment that was now due to the heirs of the estate that held the first mortgage and various other payments which were later reflected in writing which I have here and Lou who put in his equity in the property. Now, they estimated that what Mr. Wallach— Mr. Friedman would have to pay up would be about $7100.00 or thereabouts and there was $48,000.00 on the first and $10,000.00 on the second. Now, this was an estimated

amount on the second and the first was estimated at $48,000 at that time pretty close. Mr. Friedman insisted that he had to have an earnest money contract in order to make the bank, that the State Bank of Wellston or better, people associated with the State Bank of Wellston who owned the second, the bank didn't own it, I believe called Bond Investment Company controlled by some of the officers of the State Bank of Wellston owned this second and he had to make them believe that he was buying the property in order to, for him to be in a position to settle that second for $10,000.00. Q Where did you get that information, from whom? A From Mr. Friedman, he told me this in very plain unmistakable language. * * * Q Did they discuss just how much money, if any, that Mr. Friedman was to put up in connection with this business enterprise? A Well, that day, Mr. Friedman put up $2737.14 which was delivered to Mr. Obrock for the benefit of the holder of the deed of trust and for the payment of the taxes. A That was to stop foreclosure to be held that day? A Yes, sir, to be held that day and $2281.90 was to cover the foreclosure and $425.00 to cover the back taxes. Q When they were in your office before you went over to the Title Insurance Corporation office to deliver the money to stop the foreclosure, did they tell you that there had been any definite agreement as to just exactly how much money Mr. Friedman was to put up into the business? A Not in addition to these payments that were necessary to clear up the property so that it would be clear of everything but the first and the first would be current, taxes would be currently paid in addition to that one of them said and the other, whichever one said it, the other didn't deny it, that Mr. Friedman was to put in $10,000.00 operating cash into this corporation. I am sure now that I am thinking of it, I am sure it was Mr. Friedman that, he insisted that is what he was going to have to do to make this work. * * * Q Was there anything said about it on January 16 while Friedman and Mr. Lou Wallach were in your office about what was to be done with respect to the second deed of trust on the property? A Mr. Friedman was to pay that off. Q And the property, did they discuss the property to be put in a corporation? A I stated before that that was what they planned to do and each would get half of the stock of the corporation and I was to form the corporation for them. * * * Q I show you Plaintiffs' Exhibit 32 which is your copy, office copy of the earnest money and receipt, there is a consideration inserted there, $69,000.00, you know whether that was inserted by you in the office or was that already in there? A That $69,000.00 is obviously on the typewriter of my office and it was, if I recall, figured up this way; first deed of trust, $48,000.00, second deed of trust, let us say for the time being, $10,000.00, that would give you $58,000.00. The Stockhammer judgment $1000.00, that would give you $59,000 and the $10,000.00 cash to be put in for the corporation of the business, that is roughly it. They arrived at that quick in my office that morning. Q And that is how they arrived at the figure to your knowledge of $69,000.00? A Only purpose of showing the bank. * * * Q Now, do you have any independent recollection of what occurred on the 9th of March, 1961? A Yes, sir. We met again. My recollection is that it was in the title company office and it was not until we got over there that—you see, there were other details of this agreement to be carried out before the corporation could be formed or the property deeded to the corporation to be formed. There were other moneys to be paid. Now, at that time we prepared another closing statement and my recollection is that it was signed and approved by both Mr. Wallach and Mr. Friedman and each took his signed copy. * * * Q Was there anything said at that meeting on March 9, 1961 about this corporation that was to be formed? A Yes, sir. Q Do you recall what was said then? A That as soon as they could work out the details they would form the corporation. Q Now, was there a deed prepared at that time to this

property? A Yes, sir. * * * Q Do you recall when it was signed in your office; on that date was Mrs. Mollie Wallach present? A She came in to sign it I believe the day before. Q Was the deed complete in all respects? A Yes, sir. Q Was the name of Jack Joseph in the deed, do you recall? A No, not when she signed it, because we didn't know his name at that time. Q Do you know when the name of Jack Joseph was inserted in the deed? A It was inserted in the deed. Q Was that done in your office? A In my office on the same typewriter later in the day after Mr. Lou Wallach and Mr. Harold Friedman agreed on Jack Joseph as a straw party. Q Did they discuss that in your presence? A Yes, sir. Q What did they say about Mr. Joseph being a straw party, if anything. A I suggested that we should leave the deed either with Mr. Obrock or someone else and later put the corporation name in it when the corporation was formed, that would probably be the most convenient way to do it, but Mr. Friedman suggested he thought that unless he could get this in his name he didn't think he would have any luck with the holder of the second to settle that for that $10,000.00 figure and he would have to have it in someone's name that he and Lou discussed and I said, well, now, do you want it in your name and give us a private receipt for it which I would have described the whole deal and he said no, he didn't want it in his name. I didn't press for reason on that. Q And who suggested the name of Joseph, do you know? A Mr. Friedman did. Q And he said that he was to act as straw party, is that my understanding? A No, he asked if Joseph would be all right and Lou Wallach said yes, I know him well. Q They weren't conveying this property to Mr. Joseph because he was to be the real owner, were they? A The two of them in my presence, he would be a man who they would both trust to hold the title until the corporation could be formed in the meantime that Mr. Friedman would pay off the second. Mr. Friedman was the man who would be pay-

ing the second back rather than Lou Wallach. * * * Q And then would you have anything to do with the deed after it was signed up and Joseph's name was put in there? A I don't know whether the title company man recorded it or Mr. Friedman recorded it. I did not. Q But it was agreed that it would be recorded? A Yes, sir. Q And Mr. Joseph later on would give a deed to the corporation? A That was the understanding and both men trusted him to that extent. * * * Q When was the next occasion that you had any meetings with the parties if you did have a meeting? A Well, I think that I had a number of conversations with Mr. Friedman in the meantime and with Mr. Lou Wallach in the meantime about this matter and the corporation was not formed. The judgment was not satisfied. The note was not paid and the business agreement was never consummated. The whole matter was as we left it on the 9th of March, in the terminology of the lawyer, is what we call non-consummata, is nothing happened after that. * * * Q When you talked to Mr. Friedman what was the general nature of your discussion? A Well, first of all, when he was going to get around to tell me what he wanted in the way of a corporation, whose name on the stock and how much par value and the details about it. I never could get him to, neither could Mr. Lou Wallach. * * * Q I believe there was a time sometime in November of 1962 when the property was again being advertised for sale under foreclosure and I believe Mr. Lou Wallach arranged with his brother to put up the necessary funds to take it over, were you present on that occasion? A I think that you negotiated on behalf of Richard Wallach in my office with me and with Lou. Q And Mr. Richard Wallach did agree to put up the money to stop the foreclosure and upon condition that Mr. Lous Wallach deed the property over to him? A No, that was one of those, what I call a walking deed, you know, he gave him a deed all right but it wasn't to be good unless Lou Wallach failed to pay the money back at a

certain time. Q Did he ever pay the money back? A I don't know this. * * * Q Mr. Becker, at the time this earnest money contract was signed by Mr. Wallach and his wife and Mr. Friedman on January 16, 1961 and when this closing statement was prepared, did any of the parties ever tell you there was to be an actual sale of the property? A No, I made that plain. They told me this was an arrangement whereby they would both get into business together as partners."

On cross-examination, Becker testified, in part, as follows: "Q Now then, then Bill, did you discuss with Mr. Friedman the formation of that corporation? A Yes, sir. Q Now, was that sometime after March the 9th or was it prior? A On March 9 before we left my office it was my thought that I would make a deed to Friedman to this property which would be signed by Lou and Mollie Wallach and take back from Friedman a receipt outlining all of the terms of this proposed partnership agreement to be put in the form of a corporation. I so stated to them, then Friedman said, no, we can't do it that way and I didn't press it. I got to put for the time being in the straw party's name. I don't want that property to be in my personal name in the interim. Then I said, well, who is your straw party and after some hesitating and I didn't think he would know right off hand and he said, how about Jack Joseph and he looked at Lou, I know him, that's all right with me, Lou said. * * * Q Nothing abnormal about this transaction at all, was there? A Nothing. * * * Q (By Mr. Moore) This quit claim deed from Mollie Wallach and Lou Wallach to Shirley Kash, that's the one that I was talking about? A Yes, sir. * * * Q On the 20th of November, 1962. A That would be the date, yes, sir. Q Now, Mr. Becker, was there any reason for preparation of this deed and the assignment of Lou Wallach's interest to his sister and the brother? A Of course. Q What was that? A First of all that Richard paid the then due payment on the first deed of trust to save it from fore-

closure, and second of all, there was this agreement and assignment between that that outlines the consideration, and third, they were brothers, weren't they? A Yes. A That's it. * * * A As to feelings, I don't believe there was any anger between Lou Wallach on the one hand and Harold Friedman on the other until the day we filed this suit as to when Lou Wallach became aware of the fact that this thing wasn't going right. I don't know, but I know that when Mr. Friedman had not paid the Stockhammer judgment and had not paid off the second within two weeks after March 9, then I personally began to look upon the whole transaction with some degree of circumspection. Q What's that mean? A I began to have my doubts about the good intention of your client."

There are two points raised on appeal which were preserved in defendants' motion for new trial: (1) that the trial court erred, under the evidence, in granting equitable relief to plaintiffs; and (2) that the trial court erred in not finding that plaintiffs have an adequate and complete remedy at law.

The issue actually involved here is whether plaintiffs are entitled to be relieved of the legal effect of the earnest money contract and warranty deed on the ground they were induced to execute them because of false representations made by Harold Friedman.

We first recognize that when persons sign a contract and deed they are presumed to know their contents, to have accepted their terms, and that all prior negotiations are merged into the written instruments. However, when there is fraud in the inducement, we give relief and place the parties in status quo. The fraud may be proved by parol evidence. Judd v. Walker, 215 Mo. 312, 114 S.W. 979; Jackson v. Tibbling, Mo.Sup., 310 S.W.2d 909. It is also well settled that fraud may be inferred from facts and circumstances and need not be shown by direct evidence. Black v. Epstein, 221 Mo. 286, 120 S.W. 754; Cas-

torina v. Herrmann, 340 Mo. 1026, 104 S.W. 2d 297.

■ In State ex rel. Taylor v. Anderson et al., 363 Mo. 884, 893, 254 S.W.2d 609, at 615, appears a statement particularly appropriate here: "This being a suit in equity, we review the case de novo, weigh the evidence, and determine on the whole record what relief, if any, should be granted. Where, as here, however, there exists an irreconcilable conflict in the evidence on the essential fact issue involved, depending for determination on the credibility of witnesses, a situation prevails wherein the application of the rule of deference to the findings and conclusions of the trial chancellor is especially appropriate and necessary. [Citing cases.] The trial chancellor's opportunity to observe the witnesses and to hear them testify affords him a basis for determining the credibility of testimony which we do not have. A review of the entire record in this case convinces us we should defer to the trial court's conclusion that the testimony of * * * [Louis Wallach and William J. Becker] was true." In our opinion, the oral agreement testified to by Louis Wallach and William J. Becker is established by clear, cogent and convincing evidence.

■■ This Court has recognized that in equity a *state of mind* may be misrepresented and that this constitutes a misrepresentation of fact upon which actionable fraud may be based giving rise to a constructive trust. Thieman v. Thieman, Mo.Sup., 218 S.W.2d 580; Musser v. General Realty Company, Mo.Sup., 313 S.W.2d 5. It is conceded that defendants refuse to comply with the oral agreement and to recognize plaintiffs' interests therein. The evidence is sufficient to show that Harold Friedman did not intend to perform the agreement when he made it. We believe that the oral agreement by inducement procured the execution of the earnest money contract and the conveyance by deed, constituted a "misrepresentation of the fact of * * * [Friedman's] intention at the time the agreement was made," and justifies the imposition of a constructive trust as to Harold Friedman. Musser v. General Realty Co., supra, 313 S.W.2d 5, 10; Restatement, Restitution, § 166. We are of the opinion that, as to plaintiffs, Jack Joseph was a straw party in the transaction, "one of no substance, one in name only". Houtz v. Hellman, 228 Mo. 655, 669, 128 S.W. 1001, 1005. In any event, under the evidence, he must be charged as a constructive trustee of the property because the execution of the deed was induced by the fraud of Harold Friedman. Restatement, Restitution, § 167; Clifford Banking Co. v. Donovan Commission Co., 195 Mo. 262, 289, 290, 94 S.W. 527, 536.

We hold that, under the clear, cogent and convincing evidence in this case, the defendants, if permitted to retain title to or interest in the real estate, would be unjustly enriched, and that a constructive trust should be imposed in plaintiffs' favor. Restatement, Restitution, § 160; Musser v. General Realty Co., supra; Suhre v. Busch, 343 Mo. 679, 123 S.W.2d 8; Swon v. Huddleston, Mo.Sup., 282 S.W.2d 18, 25, 26, 55 A.L.R.2d 205.

■ There being fraud in this transaction giving rise to a constructive trust, plaintiffs may not be denied equitable relief on the basis that they have an adequate and complete remedy at law. "* * * The right claimed and the relief sought is the subject of original equity jurisdiction, and the case as stated could be determined on its merits only in a court of equity. The court below was right in entertaining the case regardless of whether there was or was not a remedy at law. This being true, it is not necessary to either discuss or determine whether plaintiff did or did not have a remedy at law. * * *." Ellenburg v. Edward K. Love Realty Co., 332 Mo. 766, 774, 59 S.W.2d 625, 628; Stewart v. Caldwell, 54 Mo. 536, 539.

■ This Court, sitting in equity, de novo, must administer complete justice within the scope of the pleadings and evidence,

even though plaintiffs have mistaken the specific relief to which they are entitled. The "doctrine is too well settled to admit of either discussion or dispute, that when a court of equity once acquires jurisdiction of a cause it will not relax its grasp upon the *res* until it shall have avoided a multiplicity of suits by doing full, adequate and complete justice between the parties." Real Estate Sav. Inst. v. Collonious, 63 Mo. 290, 295. Plaintiffs are entitled to equitable relief. Sayer v. Devore, 99 Mo. 437, 477, 13 S.W. 201, 204.

The judgment of the trial court is for the right parties, and it is affirmed.

All of the Judges concur.