**Richard ROGERS and Bonnie Rogers, husband and wife, and Jack Payne and Bernice Payne, husband and wife, d/b/a P & R Enterprises, Plaintiffs-Respondents,**

**v.**

**Henry HICKERSON and Elsie Hickerson, husband and wife, et al., Defendants-Appellants.**

No. 13947.

Missouri Court of Appeals, Southern District, Division One.

Aug. 14, 1986.

Motion for Rehearing or to Transfer to Supreme Court Denied Sept. 5, 1986.

Application to Transfer Denied Oct. 14, 1986.

*States,* 610 F.2d 672 (9th Cir.1980).

David E. Wilhite, Donnelly, Baldwin and Wilhite, Lebanon, for plaintiffs-respondents.

Ronald K. Carpenter, Phillips, McElyea, Walker & Carpenter Corp., Camdenton for defendants-appellants.

TITUS, Presiding Judge.

Defendants-appellants Henry and Elsie Hickerson, husband and wife, appeal from a judgment entered in a court-tried case for plaintiffs-respondents Richard and Bonnie Rogers, husband and wife, and Jack and Bernice Payne, husband and wife, d/b/a P & R Enterprises. Plaintiffs sought to recover for fraud in the sale of a parcel of real estate located by Lake of the Ozarks, Camden County, Missouri. Actual damages were awarded in the amount of $5,476.05, and punitive damages based on financial statements provided by defendants to the court were awarded in the amount of $7,500.00. The judge further ordered that defendants were to satisfy the judgment by conveying the assets shown on their financial statements to plaintiffs in the order selected by plaintiffs on the same basis of value as stated in defendants' financial statements until the judgment was satisfied. In addition, the judge ordered defendants not to convey, mortgage or otherwise burden any of the assets listed on the said financial statements until the judgments were satisfied in full.

The first question we must address is whether the judgment entered on Counts I

and II of plaintiffs' petition was final and appealable under Rule 81.06[1]. The court below ordered that Count III of plaintiffs' petition be "severed for purposes of trial" and ordered Counts I and II be tried "prior to Count III." It then proceeded to trial on Counts I and II and entered its judgment on those two counts without a jury. The court did not designate whether its judgment on Counts I and II was to be final or interlocutory. Under Rule 81.06 the judgment entered on Counts I and II "shall not be deemed final for purposes of appeal ... unless specifically so designated by the court in the judgment entered." However, the judgment entered will be deemed final for purposes of appeal if Counts I and II are for "an entirely separate and independent claim unrelated to" Count III.

Count III, brought solely by Richard Rogers, incorporated by reference the allegations of Counts I and II. Plaintiff Richard Rogers alleged in Count III that as a direct result of Henry Hickerson's telling him, at a time when he was recovering from a heart attack and heart operation, that his trailer was on someone else's land he suffered severe emotional and physical problems. These, according to Count III, resulted in permanent disabilities and damage to him in the sum of $12,000.00. Count I sought recovery for fraud in the sale of a parcel of real estate and Count II sought punitive damages for the said fraud. Counts I and II were brought by all plaintiffs herein.

In a sense all of the plaintiffs' counts arose out of the same transaction, occurrences and subject matter, to wit the fraudulent representations of the defendants. In addition, the three counts are not entirely separate as there are common questions of law and fact. Also plaintiff Richard Rogers is a plaintiff in all three counts, though he is the only plaintiff in Count III. However, Rule 81.06 is not meant to turn on similarities of this ilk. *Crenshaw v.*

*Great Central Ins. Co.*, 527 S.W.2d 1, 3 (Mo.App.1975).

A judgment disposing of claims arising from the same factual predicate as another claim in the action is to be deemed final for purposes of appeal if the remaining claim or count is independent of the claims on which judgment is entered. The test therefore being one of "dependency." *Luecke v. Mo. Dept. of Conservation*, 674 S.W.2d 691, 692 (Mo.App.1984).

Just as in *Crenshaw*, the disposition of the remaining count, sounding in personal injury to Mr. Rogers, is not dependent upon the outcome or final disposition of Count I, an action for fraud, or Count II which seeks punitives for the said fraud. The court nisi has entered a judgment disposing of all the issues raised in Counts I and II. For these reasons the judgment on Counts I and II must be deemed final for purposes of appeal for "it is apparent that the order entered was intended as a judgment separate and apart from any relief that thereafter might be given on the" remaining count. *Crenshaw*, 527 S.W.2d at 3. The "record indicates an exercise of discretion in favor of a separate judgment and nothing appears to indicate an intention that the judgment should be interlocutory or that it was to be held in abeyance until" the other count is determined. *Id.* In this situation the separate judgment on Counts I and II will be construed as an order for a separate judgment for purposes of appeal under Rule 81.06.

Before continuing, we note that in a court-tried case the trial court will be sustained unless we find no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. We will set aside a decree or judgment for being against the weight of the evidence only with caution and upon a firm belief that it is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32[1, 2] (Mo. banc 1976). Further, the trial court when sitting as the

---

**1.** Unless otherwise stated all rule references are to Missouri Rules of Court, V.A.M.R., and all statute references are to V.A.M.S.

trier of fact may believe all, part, or none of the testimony of any witness. *Best v. Culhane*, 677 S.W.2d 390, 393[3] (Mo.App. 1984).

With this perspective in mind, the evidence in part tended to show that the real estate, referred to at the trial as tracts "A" and "B", is located in an area by the Lake of the Ozarks that defendants, or entities in which defendants had a sizeable interest, had developed. Defendant Henry Hickerson testified that he participated in the development of these properties, including having surveys made and deciding where lot lines and roads were to be located. He also testified that he was a licensed real estate sales person at the time of trial who had sold over thirty tracts of land during the ten-year period before the trial.

The area where tracts "A" and "B" are located is laid out in "levels" or "tiers." [2] The lowest level is a few feet above the water line and consists of lots L1 to L6. The middle level contains the parcel of real estate involved in this dispute and consists of tracts "A" and "B". The highest level is made up of lots 1 through 8, and lots 6 and 7 of the First Addition, Lakesite Addition.

Tracts "A" and "B" were surveyed for defendant Henry Hickerson in March of 1978, and were conveyed from Ridgehaven, Inc. (in which defendants had a 25% interest) to Osage Arms Investors, Inc. (in which defendants had a 50% interest) on or about June 29, 1978. Subsequently, on or about October 31, 1978, tract "B" was conveyed to Charles L. Leeseberg and Beverly J. Leeseberg, husband and wife; and on or about November 5, 1979, tract "A" was conveyed to defendants, d/b/a Lake View Retreat, a general partnership.

Plaintiffs initially purchased lots 4 and 5 of the highest level in January or February of 1981. Defendant Henry Hickerson handled the sale to plaintiffs of these two lots for the owner acting as "a real estate broker or something to that effect." Plaintiffs testified that he also initiated discussions with them for the sale of tracts "A" and "B" as soon as they had moved their trailers onto lots 4 and 5 and began making improvements thereon. They further testified that Mr. Hickerson stated he was anxious to sell because it was the last lot defendants had and he wanted to liquidate his holdings because he was being shipped to Virginia.

Defendant Henry Hickerson denied initiating any such talks for the sale of the middle level but acknowledged that it "was the last piece of property that I had ...", that he offered to sell it at cost, and that his partner James Underwood (whom the judge found had not been served in this matter) was preparing to leave the country to go to Germany on the date the agreement to sell the parcel in question was made.

Plaintiffs testified that Henry Hickerson further represented: that the whole level or tier was owned by defendants and would be conveyed to plaintiffs; that plaintiffs would be down on that level by themselves; that plaintiffs could locate their trailers anywhere they wished because they would own the whole thing; that the drive going through the middle level could be blocked with the Rogers' trailer because plaintiffs would own the whole thing; that access was available from the east side of the level because of the road located along the side of lots 6 and 7 First Addition, Lakesite Addition; and that property boundaries ran from "road to road," that is from the road that ran to the dock in the lowest level to the road that goes along the southwest side of lots 6 and 7 First Addition, Lakesite Addition.

Plaintiffs testified they would never have purchased the property if they had known they were not getting the whole level as there would not have been enough room and there would have been no access.

**2.** Due to the size of plaintiffs' exhibit 9, a partial copy of the said exhibit follows to aid in the understanding of this description.

Plaintiffs claimed Henry Hickerson walked the entire tract with them and pointed out the boundary lines; that Mr. Hickerson never mentioned that any portion of the level was owned by another party; and that no plat map was ever shown to them by defendants at any time.

Defendants Elsie and Henry Hickerson both admitted knowing that tract "B" was owned by the Leesebergs prior to the sale to plaintiffs of tract "A".

After plaintiffs agreed to purchase the middle level, Henry Hickerson offered to and subsequently did have the deed prepared after selecting the description included in the deed.[3] Plaintiffs testified they sought no assistance in the transaction because defendant Henry Hickerson told them he could and would take care of the whole thing himself. In addition, he had advised the plaintiffs that he was a licensed real estate sales person. Plaintiff Richard Rogers said that Mr. Hickerson had told him, "Just like I did the other ... I can handle it all." On Tuesday, May 26, 1981, at plaintiff Jack Payne's office the transaction was closed. At that time plaintiffs received the deed and defendants were paid in full.

Plaintiffs did not begin making improvements on the middle level until nearly a year later when they graded and graveled the property, and installed a water system, a sewer system, electricity, and two trailers. On the day the trailers were moved in, plaintiff Richard Rogers testified that he spoke to defendant Elsie Hickerson. He stated, "I said, 'Now it is all right, isn't it Elsie, that Buzz (Henry Hickerson) said, you know we bought the whole thing. We can set these trailers and go ahead and block the road.' Because on the other tier up above he says that you have to leave the road open for at least one car. And we were fixing to block that one, and I wanted to make sure. She said, 'You bought it off of Buzz. Buzz says it, do it.' " At that time according to Richard Rogers, Elsie Hickerson made no mention that tract "B" was owned by anyone else. Defendant El-

sie Hickerson admitted she knew someone else owned the lot at the time and that she never said anything about it.

From March to mid-April of 1982, the period during which plaintiffs were making improvements on the middle level, plaintiffs testified that Henry Hickerson was around and had talked with Jack Payne about the work being done and the appearance of the property. Jack Payne testified that Elsie Hickerson observed the activity on the property daily. Richard Rogers testified that Henry Hickerson attended a Landowners' Association meeting on May 30, 1982 at the subdivision. Plaintiffs claimed that on no occasion did either defendant ever advise them that the improvements or the Rogers' trailer were located on land owned by someone else. .

Jack Payne stated that about one and a half months prior to July of 1982, he received word from another lot owner in the subdivision that the Rogers' trailer might be located on someone else's property. He went on to state that he attempted to locate property line markers but could only find a pine stake located by a trailer on the upper tier. Finally in July of 1982, after Richard Rogers had returned home from heart surgery, plaintiffs called defendants up to the front deck of the Rogers' trailer to ask about the problem. At that time Henry Hickerson finally advised them that all of the Rogers' trailer was on somebody else's lot. According to plaintiffs, he did not reveal who the owners were. In fact, the owner's name and location were not discovered until plaintiffs went to the Recorder's Office at the Camden County Courthouse. On that same day, plaintiffs obtained a plat map of the property from a surveyor. Plaintiffs thereafter negotiated with Charles and Beverly Leeseberg through Tradon Realty, Inc. for the purchase of tract "B" and did purchase the said lot on August 28, 1982, for $4,500.00.

Witness J.D. Pugh testified that at the time he and his wife were being shown lots for sale in the same subdivision as plain-

---

**3.** A copy of the deed containing the aforesaid rather lengthy description follows the opinion.

tiffs' lots by Henry Hickerson in August of 1980, Mr. Hickerson showed them lots "A" and "B". At that time he indicated to the witness that both lots were for sale. Mr. Pugh stated that he and his wife had the impression from what was said that Mr. Hickerson owned both lots.

Witness N. Rippee testified that she and her husband own lots 2 and 3 of the highest level of the subdivision. She was on her porch when Richard Rogers and Henry Hickerson walked the property on the level below. She testified to seeing Mr. Hickerson point east and west and that she asked Mr. Rogers what he was doing. Mr. Rogers replied, "I'm trying to buy the lower level."

Witness B. Hawthorne testified he was down at the boat dock with Mr. Payne when Mr. Rogers and Mr. Hickerson came down and began discussing the purchase of the "hillside property." He testified that Mr. Hickerson seemed anxious to sell. He also stated that, "The description he (Mr. Hickerson) used on several occasions was the entire level and also from the bottom road up to the road at the top on the far end." He also testified that Mr. Hickerson "indicated this was the road going down to the Lake and he indicated that the road started here, that the property line would start here and run all the way up to the top of the crown of the ridge...."

Witness Hawthorne later testified that defendant Henry Hickerson had said the boundaries of the property would consist of the "whole, complete, entire level, from road to road, starting at the lower road going up through the property to the upper road on the southeast side." Mr. Hawthorne then further stated there was no question in his mind as to what roads Mr. Hickerson meant as Mr. Rogers had asked Mr. Hickerson very pointedly "How do we get into the property and how do we get out of the property if we decide to put our trailers in there?" Mr. Hickerson replied that the plaintiffs could come in from the top road and would have an entrance at both ends of the property.

Witness Hawthorne testified Mr. Rogers was concerned about the depth of the property, so Mr. Rogers and Mr. Hickerson went up to the next level and walked over it. Mr. Hawthorne stated that he observed both of them at various times "walking the entire level."

Mr. Hawthorne also testified he was trimming tree limbs on plaintiffs' property on Sunday, May 30, 1982, during the Memorial Day Weekend, when Henry Hickerson came up to a point between plaintiffs' trailers and commented to him on how nice the property looked. Mr. Hickerson made no remark to him at that time about the Rogers' trailer being on someone else's property. Both Henry and Elsie Hickerson denied that Mr. Hickerson was present on that weekend.

Defendants raise seven points on appeal. We will first address points one and two of this multipoint appeal together. In point one defendants contend the trial court erred in permitting evidence of the oral agreement to purchase the land as such evidence was in violation of the statute of frauds and the parol evidence rule. In point two they allege the court below erred as the deed fully described the property defendants agreed to sell, further the deed was controlling in determining the property conveyed, and lastly the plaintiffs failed to show that by using reasonable diligence and ordinary care they could not have discovered they were only purchasing the land described in the deed and referred to as tract "A".

■ First we note that when a contract relating to land has been fully executed, as here, the statute of frauds no longer applies and therefore does not affect this transaction. *Ballenger v. Windes*, 99 S.W.2d 158, 159 (Mo.App.1936); 37 C.J.S. *Frauds, Statute of* § 240 (1943); Bouvier's Law Dictionary 377 (Baldwin's ed. 1934). Defendants' contentions thus center on whether the admission of parol evidence was appropriate.

■ *Judd v. Walker*, 215 Mo. 312, 114 S.W. 979 (1908) clearly answers these con-

tentions. A positive representation by a vendor, as of his own knowledge, as to the size of a tract may be relied upon by a vendee and "[d]ue diligence does not require that the vendee should suspect the vendor of lying, nor that the vendee should survey and measure the land to prevent being deceived by the lies of the vendor." In addition, a purchaser who is defrauded may hold what he received and sue at law for his damages. In proving his case such a purchaser may establish fraudulent representations which rest in parol by parol as the fraud is not merged into a written contract for sale or the deed for the premises. *Id.* at 335–38, 114 S.W. at 980–81. *See also Wallach v. Joseph,* 420 S.W.2d 289 (Mo.1967), *cert. denied,* 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 362 (1967); *Best v. Culhane,* 677 S.W.2d 390 (Mo.App.1984); *Burch v. Schmelig,* 300 S.W.2d 838 (Mo. App.1957); and *DeVoto v. Fez Construction Co.,* 271 S.W.2d 199 (Mo.App.1954). In light of the foregoing we find points one and two against defendants.

In their third point defendants contend the trial court erred in awarding damages for fraudulent misrepresentation to plaintiffs for the amount of money expended by plaintiffs to negotiate and effect the purchase of tract "B", the money to purchase tract "B", and the money expended to survey and determine the location of the property lines. We cannot agree.

 It is the law in this state that the defendant is responsible for those results, injurious to the plaintiff, which must be presumed to have been within defendant's contemplation at the time of the perpetration or commission of the fraud, and that the plaintiff may recover for any injury which is the direct and natural consequence of plaintiff's acting on the faith of defendant's false representations. Under these circumstances the plaintiffs are not limited to general damages, but may also recover special damages which have proximately resulted from the fraud. *Jurcich v. General Motors Corp.,* 539 S.W.2d 595, 601[6] (Mo.App.1976); and *Salmon v. Brookshire,* 301 S.W.2d 48, 56 (Mo.App.1957). In addi-

tion it is apparent plaintiffs were attempting to mitigate their damages and should not be penalized in their recovery. Therefore they may recover any special damages necessarily incurred solely by reason of the fraud perpetrated by defendants including the cost of having a survey made. *Miller v. Higgins,* 452 S.W.2d 121, 125 (Mo.1970); and *Brayton v. Gunby,* 267 S.W. 450, 452[6] (Mo.App.1924). Defendants' third point is denied.

Defendants next contend that the court nisi erred in awarding punitive damages against defendants as "it is obvious from the transcript that there is insufficient evidence to support a finding of fraud or malice by clear and convincing evidence especially when considering the rule that when facts comport as well with honesty as with fraud the transaction will be held as honest." We disagree.

 The elements of fraud are: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of the falsity or his ignorance of the truth; (5) his intent that his statement should be acted upon by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximately caused injury. *Ackmann v. Keeney-Toelle Real Estate Company,* 401 S.W.2d 483, 488[4] (Mo.banc 1966). Furthermore, such fraud may be inferred from facts and circumstances and need not be shown by direct evidence. *Wallach,* 420 S.W.2d at 294.

As described *supra,* the evidence was more than sufficient to establish that defendants represented to plaintiffs that they owned and were selling to plaintiffs the whole middle tier. The other elements of fraud were also clearly established. Defendants' attorneys make much ado about the supposed confusion of plaintiffs over what they were buying. But upon reading the transcript, we find no such confusion on the part of plaintiffs or their witnesses.

 We also believe the awarding of punitive damages was appropriate. Punitive damages may be awarded when fraud

has been proved if legal malice is present. Legal malice arises where there is an intentional doing of a wrongful act without just cause or excuse. There need not be any showing that the act was done wilfully or wantonly, or with spite or ill will. *Parker v. Green*, 340 S.W.2d 435, 441[10] (Mo.App. 1960).

The evidence here was more than sufficient to show defendants acted wilfully and maliciously. Both defendants acknowledged they knew lot "B" belonged to some other party when they sold tract "A" to plaintiffs. The evidence further showed that neither defendant ever acted to clear up the original representations made by defendant Henry Hickerson, although they were presented several opportunities to do so, until confronted by plaintiffs. This failure evidences their knowledge and ratification of the original representations made by Henry Hickerson and an intention to further carry out the fraud. The defendants' silence in the face of plaintiffs having placed a trailer on tract "B" and having made many improvements there, in light of the evidence showing defendants' knowledge of these acts, further indicates the wilfull and malicious nature of defendants' fraud. Point four is denied.

In point five the defendants allege the court below erred in awarding punitive damages against Elsie Hickerson in that there was no evidence presented by plaintiffs that she made any fraudulent misrepresentations to them and she is "therefore a non-culpable defendant against whom punitive damages should not have been awarded."

In addition to Elsie Hickerson's silence which was discussed in the previous point, there was evidence that she and her husband were general partners in Lake View Retreat on whose behalf Henry Hickerson was selling tract "A". Thus Henry Hickerson was an agent for the partnership and his copartners in respect to this partnership matter. As for Elsie Hickerson's liability for the commission of a wilfull tort by one of her copartners, the question is whether the act was done within the scope of the wrongdoing partner's authority. *Martin v. Yeoham*, 419 S.W.2d 937, 950–52 (Mo.App.1967); § 358.130, and § 358.150. It is unnecessary to show she had knowledge of Henry Hickerson's representations or that she subsequently ratified them in order to recover punitive damages against her as it is clear he was acting within the scope of his authority in selling the land and defendants do not contend otherwise. *Collins v. Adams Dairy Company*, 661 S.W.2d 603, 606[4] (Mo.App. 1983); *Johnson v. Allen*, 448 S.W.2d 265, 269–70 (Mo.App.1969). As punitive damages were therefore appropriately awarded against her, point five is denied.

Defendants in their sixth point allege the court nisi erred in admitting certain testimony by plaintiff Jack Payne as to what defendants' son said when plaintiffs had called Mr. Hickerson up to their trailer to ask whether the Rogers' trailer was on someone else's land. Also, defendants allege that this inadmissible and prejudicial testimony laid the foundation for further prejudicial testimony by Jack Payne as to what defendant Henry Hickerson responded. Although it is not clear that this evidence was in fact inadmissible, the admission of improper evidence in a court-tried case is not in itself grounds for reversal, at least where the improper evidence does not appear to have played a critical role in the trial court's decision. *Smead v. Allen*, 581 S.W.2d 93, 94[2] (Mo.App.1979). The burden is upon defendants to demonstrate the absence here of other sufficient competent evidence to support the decree. *Green v. Stanfill*, 641 S.W.2d 490, 491[1] (Mo.App. 1982). It suffices to say that in light of the other evidence presented by plaintiffs, defendants have failed in their burden. Point six is denied.

In their last point, defendants contend the trial court exceeded its authority by the manner in which it provided its judgment was to be satisfied. We are reluctantly compelled to agree.

The court nisi in its judgment filed on September 13, 1984, stated, "THAT defend-

ants Henry Hickerson and Elsie Hickerson convey the assets shown on their financial statements filed with the Court to plaintiffs to satisfy the judgments on both Counts I and II of the Petition herein on the same basis of value as stated in said financial statements and in the order selected by plaintiffs and further that defendants are not to convey, mortgage or otherwise burden any of the assets listed in their financial statements until these judgments are satisfied in full."

The reasoning of the court below in arriving at this unusual judgment is clear. The defendants had submitted, with the consent of plaintiffs' counsel, a financial statement instead of responding to plaintiffs' request for production of their financial documents. Plaintiffs' counsel's questioning of both defendants made it very clear that they had given no thought or effort to providing truthful and accurate information regarding their assets, in addition to demonstrating the defendants' lack of regard for our judicial system.

A few short excerpts of the examination of Henry Hickerson by plaintiffs' counsel suffice to demonstrate the lack of reliability of defendants' financial statements, as well as the lack of effort by defendants to ensure a proper valuation of their assets if not an attempt to assure their underevaluation:

Q. ... How did you come up with the six cents (referring to the value listed in the financial statement for Ridge Haven stock)?

A. The best determination of the costs that we have to pay out and the property according to the books that's available coming in, that's what it will boil down to if there's no more money spent between now and the time all the money is paid out and all the money comes in.

Q. What did you just say?

A. I don't know.

Q. I don't either. Let me go at this some other way. Have you got any bills, the Corporation?

A. Are we speaking of the Corporation?

Q. Yeah.

A. Oh, I don't know. I'm not the bookkeeper.

\* \* \* \* \* \*

Q. You, you own a half interest in that corporation (referring to Osage Arms Investors)?

A. Yes, sir.

Q. And what's the value of the Corporation?

A. I have no idea.

\* \* \* \* \* \*

Q. And what uh.... type of income do you have from them (referring to accounts receivable of Osage Arms Investors)?

A. Sir, I don't know. I don't keep the books.

The court nisi after listening to plaintiffs' unsuccessful efforts to elicit from defendant Henry Hickerson how he arrived at the values he placed in his financial statement stated, " ... I just wanted to tell you that I see your point and I think we can go to another matter. I can handle this problem if need be at the close of the case."

Though we agree with the reasoning behind the trial court's judgment, we cannot agree with its methodology. Our supreme court has directed the manner in which executions are to be carried out in Rule 76. Rule 76.09 provides that the "person whose property is levied upon may select the property ... [and] [t]he sheriff *shall* levy *only* upon the property selected unless he believes the property selected is not sufficient to satisfy the execution." (Emphasis ours). Rule 76.12 permits the person whose property is levied upon to select the order of sale and again provides that "The sheriff *shall* proceed according to such election." (Emphasis ours).

In light of this directive, we do not believe it to be permissible for a court to direct that a plaintiff may avoid the execution process for a money judgment by selecting the property of defendants he

wishes, in the order he wishes, at a preset value. Rather the court should render a judgment which may then be executed upon as directed by the rules.

■ As to the last portion of the trial court's judgment which provided that the "defendants are not to convey, mortgage or otherwise burden any of the assets listed in said financial statements until these judgments are satisfied in full," we believe the rules and statutes pertaining to judgment liens are sufficient to protect plaintiffs' interests. We therefore find that this portion of the judgment is also outside the trial judge's authority under these facts.

Rule 84.14 directs us to finally dispose of this cause unless justice requires otherwise. As plaintiffs did not appeal, and defendants have not in any way contested the amount of the punitive damage award nor demonstrated any reason why they should be given an opportunity to reduce the award we shall lay this litigation to rest. It is therefore ordered that the following language be removed from the judgment of the trial court filed on September 13, 1984: "and further that said defendants shall convey the assets shown on said financial statements to plaintiffs to satisfy the judgments on Counts I and II on the basis of the values as stated in said financial statement and in the order selected by plaintiffs; and further that defendants are not to convey, mortgage or otherwise burden any of the assets listed on said financial statements until these judgments are satisfied in full" and "IT IS FURTHER ORDERED, ADJUDGED AND DECREED BY THE COURT THAT defendants Henry Hickerson and Elsie Hickerson convey the assets shown on their financial statements filed with the Court to plaintiffs to satisfy the judgments on both Counts I and II of the Petition herein on the same basis of value as stated in said financial statements and in the order selected by plaintiffs and further that defendants are not to convey, mortgage or otherwise burden any of the assets listed in their financial statements until these judgments are satisfied in full."

In all other respects, the judgment stands affirmed.

FLANIGAN and GREENE, JJ., concur.

# GENERAL WARRANTY DEED

With Statutory Acknowledgments

..1 229 msg 493

<div style="float:right">2131 x</div>

THIS INDENTURE Made on the __26__ day of __May__ A.D. One Thousand Nine Hundred and __Eighty-One__ by and between

**LAKE VIEW RETREAT, a General Partnership**

of __Pulaski County, Missouri__ parties of the first part,

and **P. & R. ENTERPRISES**

RT. 6 BOX ... LEBANON, MO. 65536

of the County of __Laclede__ in the State of __Missouri__ parties of the second part.

WITNESSETH, That the said parties of the first part, in consideration of the sum of

**TEN DOLLARS and OTHER CONSIDERATIONS** DOLLARS

to them paid by the said parties of the second part, the receipt of which is hereby acknowledged, do by these presents GRANT, BAR-GAIN AND SELL, CONVEY AND CONFIRM, unto the said parties of the second part, their heirs and assigns, the following described Lots, Tracts or Parcels of Land, lying being and situated in the County of __Camden__ and State of Missouri, to-wit:

That part of the Northwest Quarter of the Southwest Quarter of Section 22, Township 39 North, Range 17 West, Camden County, Missouri, described as follows: From the Northwest corner of the Southwest Quarter of said Section 22, run South along the West line of the Northwest Quarter of the Southwest Quarter 414.0 feet to and intersecting the centerline of a road; thence leaving said West line, run along the road centerline, South 23 degrees 29 minutes East 95.0 feet; thence South 10 degrees 19 minutes East 49.2 feet to and inter-secting the centerline of a road to the left, 30.0 feet wide; thence along the centerline of said road to the left, North 89 degrees 38 minutes East 111.4 feet for the place of beginning; thence continue along centerline, North 89 degrees 38 minutes East 76.8 feet; thence North 64 degrees 20 minutes East 235.1 feet; thence leaving the road, North 35 degrees 48 minutes West 55.3 feet; thence North 52 degrees 42 minutes East 125.0 feet; thence North 67 degrees 30 minutes East 55.0 feet; thence North 82 degrees 02 minutes East 55.0 feet; thence North 84 degrees 46 minutes East 55.0 feet; thence South 77 degrees 12 minutes East 55.0 feet; thence South 73 degrees 04 minutes East 110.0 feet; thence South 62 degrees 29 minutes East 50.0 feet; thence North 26 degrees 31 minutes East 121.1 feet; thence North 53 degrees 46 minutes West 10.84 feet; thence North 76 degrees 07 minutes West 82.6 feet; thence South 87 degrees 28 minutes West 117.2 feet; thence South 78 degrees 28 minutes West 142.5 feet; thence South 59 degrees 43 minutes West 97.4 feet; thence South 48 degrees 23 minutes West 233.8 feet; thence South 63 degrees 08 minutes West 189.7 feet to the place of beginning.

Subject to road right of way.

Subject to all restrictions, reservations, conditions and easements of record and to all existing roads and power lines, whether of record or not.

TO HAVE AND TO HOLD the premises aforesaid, with all and singular the rights, privileges, appurtenances and immunities there-to belonging or in anywise appertaining, unto the said parties of the second part, and unto their heirs, and assigns, FOREVER, the said Grantors hereby covenanting that they are lawfully seized of an indefeasible estate in fee in the premises herein conveyed, that they have good right to convey the same; that the said premises are free and clear of any incumbrances done or suffered by them or those under whom they claim; and that they will WARRANT AND DEFEND the title to the said premises unto the said parties of the second part, and unto their heirs and assigns, FOREVER, against the lawful claims and demands of all persons whomsoever.

IN WITNESS WHEREOF, The said parties of the first part have hereunto set their hands and seals, the day and year first above written.

_____ (SEAL)
HENRY HICKERSON

_____ (SEAL)
JAMES UNDERWOOD

_____ (SEAL)
ELSIE HICKERSON

_____ (SEAL)
MARGARET UNDERWOOD

STATE OF MISSOURI,
County of __Pulaski__ } ss.

On this __26__ day of __May__, 19 81

before me personally appeared **HENRY HICKERSON and ELSIE HICKERSON, husband and wife and JAMES UNDERWOOD and MARGARET UNDERWOOD**

his wife, to me known to be the persons described in and who executed the foregoing instrument, and acknowledged that they executed the same as their free act and deed Henry Hickerson, Elsie Hickerson, James Underwood and Margaret Underwood further state that they are all the general partners of Lake View Retreat.
IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal, at my of-fice in _____ the day and year first above written.

My term of office as a Notary Public will expire __March 15__, 19 82.

_____
Pat Blevins Notary Public